STATE OF CONNECTICUT *v.* BUDDY BEAVERS
(SC 17778)

Norcott, Katz, Vertefeuille, Zarella and Schaller, Js.

Argued October 21, 2008—officially released February 17, 2009

*Annacarina Jacob*, senior assistant public defender, for the appellant (defendant).

*Timothy J. Sugrue*, senior assistant state's attorney, with whom, on the brief, were *Scott J. Murphy*, state's attorney, and *Brian Preleski*, senior assistant state's attorney, for the appellee (state).

*Opinion*

NORCOTT, J. The principal issue in this appeal is whether, in an arson murder trial, testimony by the defendant's former wife about his prior uncharged misconduct, including his burning of their house trailer for insurance money, his statement to her that he previously had committed arson for hire, and his threat to burn down their home, was admissible under § 4-5 (b) of the Connecticut Code of Evidence.[1] The defendant,

---

[1] Section 4-5 of the Connecticut Code of Evidence provides: "(a) Evidence of other crimes, wrongs or acts inadmissible to prove character. Evidence of other crimes, wrongs or acts of a person is inadmissible to prove the bad character or criminal tendencies of that person.

"(b) When evidence of other crimes, wrongs or acts is admissible. Evidence of other crimes, wrongs or acts of a person is admissible for purposes other than those specified in subsection (a), such as to prove intent, identity, malice, motive, common plan or scheme, absence of mistake or accident, knowledge, a system of criminal activity, or an element of the crime, or to corroborate crucial prosecution testimony.

"(c) Specific instances of conduct when character in issue. In cases in which character or a trait of character of a person in relation to a charge,

Buddy Beavers, appeals directly to this court[2] from the judgment of guilty, rendered after a jury trial, of arson murder in violation of General Statutes § 53a-54d,[3] attempted murder in violation of General Statutes §§ 53a-54a and 53a-49,[4] and arson in the first degree in violation of General Statutes § 53a-111.[5] On appeal, the

claim or defense is in issue, proof shall be made by evidence of specific instances of the person's conduct."

[2] The defendant appeals directly to this court pursuant to General Statutes § 51-199 (b) (3).

[3] General Statutes § 53a-54d provides: "A person is guilty of murder when, acting either alone or with one or more persons, he commits arson and, in the course of such arson, causes the death of a person. Notwithstanding any other provision of the general statutes, any person convicted of murder under this section shall be punished by life imprisonment and shall not be eligible for parole."

[4] General Statutes § 53a-54a provides in relevant part: "(a) A person is guilty of murder when, with intent to cause the death of another person, he causes the death of such person or of a third person or causes a suicide by force, duress or deception; except that in any prosecution under this subsection, it shall be an affirmative defense that the defendant committed the proscribed act or acts under the influence of extreme emotional disturbance for which there was a reasonable explanation or excuse, the reasonableness of which is to be determined from the viewpoint of a person in the defendant's situation under the circumstances as the defendant believed them to be, provided nothing contained in this subsection shall constitute a defense to a prosecution for, or preclude a conviction of, manslaughter in the first degree or any other crime. . . ."

General Statutes § 53a-49 provides in relevant part: "(a) A person is guilty of an attempt to commit a crime if, acting with the kind of mental state required for commission of the crime, he: (1) Intentionally engages in conduct which would constitute the crime if attendant circumstances were as he believes them to be; or (2) intentionally does or omits to do anything which, under the circumstances as he believes them to be, is an act or omission constituting a substantial step in a course of conduct planned to culminate in his commission of the crime. . . ."

[5] General Statutes § 53a-111 provides in relevant part: "(a) A person is guilty of arson in the first degree when, with intent to destroy or damage a building, as defined in section 53a-100, he starts a fire or causes an explosion, and (1) the building is inhabited or occupied or the person has reason to believe the building may be inhabited or occupied; or (2) any other person is injured, either directly or indirectly; or (3) such fire or explosion was caused for the purpose of collecting insurance proceeds for the resultant loss; or (4) at the scene of such fire or explosion a peace officer or firefighter is subjected to a substantial risk of bodily injury. . . ."

defendant claims that the trial court improperly admitted his former wife's testimony in violation of: (1) the rule against the admission of propensity evidence; Conn. Code Evid. § 4-5; and (2) the marital communications privilege. The defendant also claims that the trial court improperly admitted the state arson investigator's opinion testimony concerning the ultimate issue in this case, namely, whether the fire was set intentionally, in violation of § 7-3 (a) of the Connecticut Code of Evidence.[6] We disagree with these claims, and, accordingly, we affirm the judgment of the trial court.

The record reveals the following relevant facts, which the jury reasonably could have found, and procedural history. On December 9, 1998, the defendant resided in a town house at 95 Shawn Drive in Bristol with Wilma Jean Beavers, his mother and the victim in this case, Lee Atkins, the victim's boyfriend, and James Beavers (James), the defendant's fifteen year old son. At approximately 4 o'clock in the morning on that date, the defendant ran to the adjacent town house of Doreen DeGenova, and asked her to call the fire department because there was a fire and he thought that Atkins was still in the house. Brian Gould, the first police officer to arrive on the scene, observed the town house engulfed in flames, and was alerted by the gathering crowd that a person, subsequently identified as the victim, was lying on the floor just inside the front door. The intense heat prevented Gould and other police officers from entering the building to rescue the victim prior to the arrival of the fire department shortly thereafter. Gould spoke with the defendant, who related that he, the victim and James had run out of the building, but that the victim had reentered the building in an attempt

---

[6] Section 7-3 (a) of the Connecticut Code of Evidence provides: "General rule. Testimony in the form of an opinion is inadmissible if it embraces an ultimate issue to be decided by the trier of fact, except that, other than as provided in subsection (b), an expert witness may give an opinion that embraces an ultimate issue where the trier of fact needs expert assistance in deciding the issue."

to assist Atkins, who had been having great difficulty walking because he was recovering from a recent hip replacement surgery.[7] It turned out, however, that James already had assisted Atkins in exiting the building when the victim reentered the structure and became trapped in the fire. Although the defendant kicked the front door off its hinges in an attempt to gain entry so that he and James could rescue the victim, they were unable to drag her to safety. Harold Carver, the state chief medical examiner, testified that the victim died of smoke inhalation.

Members of numerous law enforcement agencies investigated the fire, including Christopher Lennon, a detective with the Bristol police department, and Joseph Paola and Kevin McGurk, state troopers and certified fire marshals, from the state fire marshal's office. Lennon interviewed the defendant the morning after the fire; first at Bristol Hospital, and later at police headquarters. Lennon noticed during both interviews that, when the defendant agreed to empty his pockets so that Lennon could secure his clothes, the defendant possessed a lighter and a book of matches. At the police station interview, the defendant voluntarily signed a waiver of his rights and gave a statement about the fire, which was admitted into evidence.[8] When asked about

---

[7] Atkins died shortly before the trial in this case.

[8] On December 9, 1998, later on the morning of the fire, the defendant gave the following statement to the police: "I've been staying with my Mom, Jean, since the middle of September because me and my wife are getting a divorce. My son James was with me. [Atkins] also lives with Jean. He and Jean have been together for about [nine] years.

"I was asleep downstairs on the couch in the living room. My Mom woke me up screaming and hollering that the house was on fire. Mom was in the living room running around. There was a lot of smoke but no flames. The house was dark. I got up and we both went running towards the kitchen to go out. Mom stopped and said that James and [Atkins were] still upstairs. I said that I'd go back and get them. Mom had a phone and was trying to dial it. She was saying that it wouldn't work. She had the portable phone. The base unit was on the kitchen table next to the door. The phone may have been unplugged because [Atkins] would unplug them all the time because Wanda [Altizar] would call at 6:30 am.

the lighter and the matches, the defendant stated that he did not smoke, but needed them to light a blowtorch at work with the Eastern Water and Development Corporation (Eastern).

The defendant returned for a second interview with Lennon in April, 1999, at which time he signed another

"I went halfway up the stairs and couldn't go any farther because of the smoke. James was helping [Atkins] down the stairs. [Atkins] was screaming to open the front door. I started moving the cabinet that my Mom had in front of the door, and moving the chair out of the way. I had to fight with the door because it had a chain on it. [Atkins] was still screaming to open the door. I got the door open and went out. [Atkins and] James came out behind me. [Atkins] was hollering, 'Where's Jean?'

"I went running around the driveway because I thought she might be out back. She wasn't. I tried to open the kitchen door. The door was popping and crackling and there was too much smoke and flames. That was the first time I saw flames. They were in the kitchen. They weren't there the first time me and Mom went in there. I couldn't open the door so I ran back around the front.

"James was hollering that there was something against the door. We were reaching in trying to move whatever it was. [I] didn't know that it was Mom. The neighbor, [DeGenova], started screaming to break the window. I ran around to the living room window where [DeGenova] was standing. [DeGenova] was hollering, 'Granny.' I broke out the window with my fist. A piece came down and hit me in the side and cut me. I was yelling, 'Mom.' I got no response so I ran back around to the front. I star[t]ed kicking the front door. I don't [know] if James was helping or not. We kicked it completely off of the hinges.

"I started pulling the door out of the house and James and [Atkins] both started screaming, 'There she is, there she is.' My Mom was laying next to where the door was, behind the chair, I guess. Her body and hair was on fire. I tried to reach in to get her and got ahold of her nightgown. When I started pulling to get her out, her nightgown ripped right off of her body. I fell off of the porch backwards and I guess that is when I broke my arm. The police showed up and then the fire department started showing up.

"I don't smoke. James smokes. He's not allowed to smoke in the house but my Mom said that he's been hanging out the upstairs window smoking. No one else smokes. [Atkins] does smoke cigars but he is not allowed to smoke them right now and usually does it out in the driveway when he's working on a vehicle.

"I went to sleep about 10 pm. I know because I was watching Dumb and Dumber on TV. The [kerosene] heater was not on. I am sure because if it's on, it burns me up. Mom would usually wake James up in the morning for school and then bring it into the kitchen to turn it on."

statement.[9] In that statement, the defendant said that James had told him that the victim had "words with him about not smoking in the house," so he had started smoking in the basement instead. The defendant said that James had told him that he knocked over an ashtray next to the dryer, and did not necessarily pick up all the cigarette butts, and was crying and said that he started the fire "that . . . killed Granny." The defendant stated that he had assured James that the fire was an accident and that he did not kill the victim. James Palmer, a retired detective from Bristol who had participated in the April interview, testified that the defendant diagrammed the basement, and showed the officers

---

[9] In the April, 1999 interview, the defendant averred: "There was a fire at my mother's house at 95 Shawn Dr. in Bristol. My mother, Wilma Jean Beavers died in the fire. The fire was on December [9], 1998.

"My son James was already back living in West Virginia with his mother, Donna Beavers. I called James on a Wednesday. I don't remember the exact date. It was not long after the fire. James said he had already talked to the insurance guy. I told James about having a job at the Wolcott Motor Inn. I had called my Dad, and my Dad went and got James for me.

"I asked James how he was doing. He seemed different and the more we talked the more distraught he got. I was asking him what was wrong. He started crying. I thought he was upset about something else. James said he had something to tell me. He was telling me how Granny (Wilma Jean) had caught him smoking upstairs several times and had words with him about not smoking in the house. James said he had started smoking down in the basement. He said that he had went to put his cigarette out in the ashtray next to the dryer. He spilled the ashtray over next to the dryer. He was crying and said that he moved stuff around and was trying to pick them (the cigarette butts) up but he didn't get them all up. He said, 'I know I didn't,' over like [three] or [four] times. There was a table, a clothes pile and boxes next to the dryer.

"I was telling James that it was an accident and no one was mad at him. James kept saying that he knows he did it and that he killed Granny. I told him that it was an accident and that he didn't kill her. He was crying, telling me about hearing her inside calling for him and that he couldn't get the door open.

"I had nothing to do with this fire. I have not told James to say anything about this fire. I have not talked to him since this conversation. I told Kurt Fuchs of Wheeler Clinic what James told me, not long after James told me this. I had called him from the Red Cross in Bristol right before I got arrested.

"James was smoking in the basement because it was cold outside."

where James allegedly had started the fire, specifically, near the clothes dryer.

Paola and McGurk investigated the fire for the state fire marshal's office, and concluded that the fire's burn pattern indicated that it had started in the basement of the town house, and traveled upward quickly through the house.[10] Paola concluded that the area around the washer and dryer was the specific point of origin, based on the extensive damage and number of combustibles there, including clothing and cardboard boxes that drew the fire to that corner and up the nearby stairs. Significantly, the investigators concluded that cigarettes did not start the fire, as there were no ashtrays, cigarettes or remnants of cigarette filters, which are noncombustible fiberglass, near the area of origin.[11] Although the investigators discovered a cigar hidden between layers of clothing near the area of origin, they concluded that it was a "red herring," rather than a "red flag" because it appeared that it never had been burned or smoked, and none of the clothing above it had burned either. After ruling out thermonuclear, electrical, mechanical and providential causes, the investigators concluded that the fire was set by human intervention, either acci-

---

[10] Paola testified that the exterior of the town house had only minimal fire damage. With respect to its interior, Paola found that the second floor had incurred only smoke and heat damage, but that the fire damage became progressively worse downstairs in the living room and kitchen. They concluded that a kerosene heater in the living room was damaged, but was not the cause of the fire. Paola testified that the heat and damage patterns also led himself and McGurk to rule out the living room and the kitchen as areas of origin for the fire.

[11] McGurk testified that a cigarette must be lit and partially covered, rather than just dropped, for it to cause a fire rather than merely a scorch mark. Moreover, James testified that neither the defendant nor the victim smoked, but that he smoked Marlboro Reds, a filtered cigarette, and that Atkins smoked cigars occasionally. James testified that he was not supposed to smoke in the house, but occasionally did smoke out of his bedroom window or out the back door, but never in the basement. He also stated that he never told anyone that he smoked in the basement.

dentally or intentionally, via open flame such as matches or a lighter. Inasmuch as the investigators' accelerant detection dog did not detect any accelerants in the area of origin,[12] the fire could not be classified as intentionally caused until more information, namely, results from Lennon's interviews with the defendant, James and Atkins, became available.

In addition to this evidence, the jury heard substantial circumstantial evidence to support a finding that the defendant had started the fire in an unsuccessful attempt to kill Atkins after the two men had an argument the night before about what to do with $18,600 from a recently liquidated retirement account that belonged to the victim.[13] Indeed, Wanda Altizar and Mary Bellamy, the victim's sisters, and Vance Atkins, Lee Atkins' son, testified about the defendant and Atkins' long-standing dislike for each other, and the fact that neither man wanted the other to live in the house. Moreover, at the victim's wake, the defendant commented multiple times to Donna Lambert, his half-sister, and to Bellamy and Altizar, that, "it shouldn't have been Mom there in the coffin," and that Atkins should have been there instead.

Donna Ramsey, who had been married to the defendant from 1981 until 1998, testified that, when they first were married in the early 1980s, the defendant had

---

[12] Paola testified that there was a gasoline container with "some product in it" in the basement, but that he did not believe that it contributed to the fire. McGurk testified, however, that not all intentionally set incendiary fires are set with an accelerant, and some simply may be set via open flame.

[13] Wanda Altizar, the victim's sister, testified that the victim had informed her that Atkins wanted to invest the money in a trailer, but the defendant wanted it to purchase a car instead. Neither man was aware that the victim already had given the money to Altizar, approximately two weeks before the fire, with the intention that it be used eventually for the victim's funeral expenses. On the night prior to the fire, Altizar and the victim were together, and the victim told Altizar that she felt trapped in the middle of a dispute between Atkins and the defendant. While subsequently speaking to the victim again that night via telephone, Altizar overheard Atkins and the defendant arguing about the victim's money.

expressed his desire to burn down the trailer in which they lived in West Virginia to get insurance money because they could not afford to fix its floors and appliances. One day in 1982, the defendant told Ramsey to get out of the trailer, which burned down immediately thereafter;[14] they used the insurance check to put a down payment on furniture and rent an apartment. Several years later, in 1985 or 1986, the defendant stated to Ramsey that he had made money setting fires for people, although he was never arrested or convicted of any a crime as a result thereof. Ramsey also testified that, in the mid-1990s, the defendant threatened to burn down the couple's house on multiple occasions, although she acknowledged that he frequently had made threats that were not serious.

Finally, multiple witnesses, including DeGenova and Vance Atkins, testified that, at the time of the fire, the defendant was dressed in jeans and a T-shirt, with tied sneakers, while the other occupants of the house were barefoot or in slippers. Moreover, the defendant mentioned during the interviews with Lennon that the fire started in the basement of the town house, allegedly because of James' smoking, despite the fact that the fire's point of origin was known at that time only to the investigators. Finally, despite the defendant's claim that he needed the lighter and book of matches for his work at Eastern, his last day of working there had been November 20, 1998, more than two weeks before the fire.[15]

---

[14] The defendant did not say how he intended to burn the trailer, and Ramsey did not actually see him set the fire.

[15] Other circumstantial evidence also indicated that the defendant was not unfamiliar with fire safety concerns, as he had completed numerous fire fighting and fire safety courses while employed by Otis Elevator Company from May, 1988, until February, 1992. Moreover, Joanne Martin, the defendant's other former wife and the victim's former next-door neighbor, testified that when she spoke with the defendant at the fire scene, he told her that the smoke detector on the second floor of the house lacked a battery.

The state charged the defendant with arson murder in violation of § 53a-54d, attempted murder in violation of §§ 53a-49 and 53a-54a, and arson in the first degree in violation of § 53a-111 (a) (1), and the case was tried to the jury. After the trial court denied the defendant's oral motion for a judgment of acquittal, the jury returned a verdict finding the defendant guilty on all three counts charged. After denying the defendant's motion for a new trial, the trial court rendered a judgment of guilty in accordance with that verdict, and sentenced the defendant to a total effective sentence of seventy-five years imprisonment, to run consecutive to any sentence then being served by the defendant. This appeal followed. See footnote 2 of this opinion. Additional relevant facts and procedural history will be set forth in the context of each specific claim on appeal.

On appeal, the defendant claims that the trial court improperly admitted Ramsey's testimony into evidence: (1) under the prior misconduct rule, § 4-5 (b) of the Connecticut Code of Evidence; and (2) in violation of the marital communications privilege. The defendant also contends that the trial court improperly allowed McGurk to testify about the ultimate issue in the case, namely, whether the fire was intentionally set, in violation of § 7-3 (a) of the Connecticut Code of Evidence.

"The applicable standard of review for evidentiary challenges is well established. We review the trial court's decision to admit evidence, if premised on a correct view of the law . . . for an abuse of discretion. . . . We will make every reasonable presumption in favor of upholding the trial court's ruling, and only upset it for a manifest abuse of discretion. . . . When an improper evidentiary ruling is not constitutional in nature, the defendant bears the burden of demonstrating that the error was harmful. . . . [A] nonconstitutional error is harmless when an appellate court has a fair assurance that the error did not substantially affect

the verdict." (Citations omitted; internal quotation marks omitted.) *State* v. *Snelgrove*, 288 Conn. 742, 758, 954 A.2d 165 (2008), quoting *State* v. *Saucier*, 283 Conn. 207, 218, 926 A.2d 633 (2007), *State* v. *Ritrovato*, 280 Conn. 36, 50, 905 A.2d 1079 (2006), and *State* v. *Sawyer*, 279 Conn. 331, 350, 357, 904 A.2d 101 (2006).

I

A

The defendant's first claim is that the trial court improperly admitted Ramsey's testimony that the defendant had burned down their trailer for insurance money, had told her that he had set fires for money, and, in the mid-1990s, had threatened to burn down their home. Specifically, the defendant argues that the trial court improperly admitted this evidence under § 4-5 (b) of the Connecticut Code of Evidence to show "absence of accident" and that the fire was intentionally set, because that evidence was irrelevant and lacked a connection to the fire in this case. The defendant also argues that Ramsey's testimony was impermissible propensity evidence because he never claimed that he had started the fire accidentally, but rather, that his son had admitted that he accidentally had caused the fire. Finally, the defendant argues that, even if the evidence was relevant under § 4-5 (b), the prejudicial effect of the prior misconduct evidence outweighs its probative value.

In response, the state contends that the trial court properly admitted the prior misconduct evidence because it was relevant to prove the defendant's intent, despite his claim that he had nothing to do with the fire, because intent was an element of each charged offense that the state was required to prove. The state also argues that the probative value of the prior misconduct evidence exceeded its prejudicial effect because it spanned a continuum of time that was proximal to

the fire, and that the trial court limited its use in a manner that kept the jury from using it improperly as propensity evidence. We agree with the state, and conclude that the prior misconduct evidence was admissible to prove the defendant's intent and the absence of an accident.

The record reveals the following additional facts and procedural history. Prior to trial, the defendant filed a motion in limine requesting that the trial court "establish fair procedures for determining the admissibility of evidence concerning the alleged involvement of the defendant in prior or subsequent acts of misconduct or uncharged crimes." At trial, the trial court heard voir dire testimony from multiple witnesses about numerous alleged acts of prior misconduct by the defendant, including: (1) his arson conviction arising from a fire at the property of his previous employer, Otis Elevator Company; (2) his statements that he had participated as a lookout at an arson fire at a mill in West Virginia, and also had helped police officers there dispose of a body of someone whom the officers had murdered; and (3) his statement in the early 1990s that his family would become rich if he killed his mother. The trial court also heard voir dire testimony from Ramsey that, while she was married to the defendant, he had: (1) burned down their trailer for insurance money; (2) made money as a professional arsonist; and (3) threatened, during a fight, to burn down their house to kill her and their children. The state claimed that all of these bad acts were admissible under § 4-5 (b) of the Connecticut Code of Evidence and State v. Nardini, 187 Conn. 513, 447 A.2d 396 (1982), to prove the defendant's motive to profit from Atkins' death and his intent to burn the property, as well as his indifference toward his mother's life. In response, the defendant claimed, inter alia, that the prejudice to him from the admission of these prior bad acts exceeded their probative value because they

were remote in time from the trial, and also that there was no proof that the defendant had engaged in that conduct.

The trial court subsequently concluded that, of the proffered prior misconduct evidence, only Ramsey's testimony was admissible, albeit in limited part. Specifically, the trial court concluded that she could testify that the defendant had set fire to their trailer to collect insurance money, to prove the absence of mistake or accident under § 4-5 (b) (6) of the Connecticut Code of Evidence. The trial court noted that the defendant had "injected accidental causes as an explanation for this fire" through his statement to the police attributing the fire to James' smoking. The trial court also ruled that the probative value of the evidence outweighed its prejudicial effect, given the "peculiar or unique" nature of arson as a crime. Thus, the trial court also permitted Ramsey to testify that the defendant told her that he had committed arson for money, as well as his threats to burn down their home. To avoid undue prejudice to the defendant, the trial court required the state to "sanitize" the threat to burn down their house by not permitting Ramsey to testify that his intent was to kill her and their children. The defendant then took an exception to the trial court's ruling, preserving this issue for appeal.

"As a general rule, evidence of prior misconduct is inadmissible to prove that a criminal defendant is guilty of the crime of which the defendant is accused. . . . Such evidence cannot be used to suggest that the defendant has a bad character or a propensity for criminal behavior. . . . On the other hand, evidence of crimes so connected with the principal crime by circumstance, motive, design, or innate peculiarity, that the commission of the collateral crime tends directly to prove the commission of the principal crime, is admissible. The rules of policy have no application whatever to evidence

of any crime which directly tends to prove that the accused is guilty of the specific offense for which he is on trial. . . . We have developed a two part test to determine the admissibility of such evidence. First, the evidence must be relevant and material to at least one of the circumstances encompassed by the exceptions [set forth in § 4-5 (b) of the Connecticut Code of Evidence]. . . . Second, the probative value of the evidence must outweigh its prejudicial effect. . . . Because of the difficulties inherent in this balancing process, the trial court's decision will be reversed only whe[n] abuse of discretion is manifest or whe[n] an injustice appears to have been done. . . . On review by this court, therefore, every reasonable presumption should be given in favor of the trial court's ruling." (Citations omitted; internal quotation marks omitted.) *State* v. *Randolph*, 284 Conn. 328, 340, 933 A.2d 1158 (2007); id., 339–40 (explaining common scheme or plan exception under § 4-5 [b]); see also Conn. Code Evid. § 4-5 (a) ("[e]vidence of other crimes, wrongs or acts of a person is inadmissible to prove the bad character or criminal tendencies of that person").

The well established exceptions to the general prohibition against the admission of uncharged misconduct are set forth in § 4-5 (b) of the Connecticut Code of Evidence, which provides in relevant part that "[e]vidence of other crimes, wrongs or acts of a person is admissible . . . to prove intent, identity, malice, motive, common plan or scheme, absence of mistake or accident, knowledge, a system of criminal activity, or an element of the crime, or to corroborate crucial prosecution testimony."

The trial court admitted the uncharged misconduct evidence herein pursuant to the "absence of mistake or accident" exception articulated in § 4-5 (b). "The 'absence of mistake or accident' exception . . . is a close corollary of the 'intent' exception: evidence of

prior misconduct may be admissible for the purpose of showing that an action was intentional and not mistaken or accidental." *Young* v. *Rabideau*, 821 F.2d 373, 380 (7th Cir.), cert. denied, 484 U.S. 915, 108 S. Ct. 263, 98 L. Ed. 2d 221 (1987). Indeed, we also have recognized that the same uncharged misconduct evidence admissible to prove a defendant's intent may be admitted for the dual purpose of proving that an occurrence was the result of an intentional act, rather than an accident.[16] See *State* v. *Tucker*, 181 Conn. 406, 415–16, 435 A.2d 986 (1980) (Acts of prior child abuse "are relevant to establish, in connection with the question of intent, a pattern of behavior and an attitude toward the child that is indicative of the defendant's state of mind. . . . This evidence was also admissible to prove that the death of the child resulted from an intentional act rather than from an accident." [Citations omitted.]); see also *State* v. *Baldwin*, 224 Conn. 347, 355, 618 A.2d 513 (1993) ("evidence that the defendant had been a seller of narcotics in the past is relevant to 'the nature of his possession of the drug at the time of the alleged offense' " of possession with intent to sell); but cf. *State* v. *Meehan*, 260 Conn. 372, 395–96, 796 A.2d 1191 (2002) (emphasizing that prior misconduct evidence may be used to prove state of mind, but not commission of

---

[16] The interchangeability of the "intent" and "absence of mistake or accident" factors under § 4-5 (b) of the Connecticut Code of Evidence is reflected in the commentary to that section, which states that the enumerated "purposes . . . for which other crimes, wrongs or acts evidence may be admitted are intended to be illustrative rather than exhaustive. Neither subsection (a) nor subsection (b) precludes a court from recognizing other appropriate purposes for which other crimes, wrongs or acts evidence may be admitted, provided the evidence is not introduced to prove a person's bad character or criminal tendencies, and the probative value of its admission is not outweighed by any of the Section 4-3 balancing factors." Cf. *State* v. *Merriam*, 264 Conn. 617, 667–68, 835 A.2d 895 (2003) (improper admission of prior misconduct evidence to prove identity of perpetrator of sexual abuse was harmless error because that "evidence was properly before the jury, albeit under [the common plan or scheme] exception to the general rule against the admission of prior misconduct evidence").

act, in concluding that testimony that defendant police officer "allegedly took some of [the witness'] money during a search for illegal narcotics does not render it more or less likely that the defendant, during a subsequent, unrelated search of [another suspect], had the specific intent to appropriate the money in [that suspect's] possession").

Thus, we conclude that the trial court did not abuse its discretion in admitting Ramsey's testimony, which was not inappropriate propensity evidence, but rather, was admissible evidence that the defendant, once identified as the perpetrator, had intended to start the fire, and therefore, it was not an accident. First, we note that the uncharged misconduct evidence was properly admitted to prove the defendant's specific intent, an element that the state was required to prove in this case, after it first established that the defendant had caused the fire.[17] See, e.g., *United States* v. *Latouf*, 132

---

[17] "[T]he government's purpose in introducing the [uncharged misconduct] evidence must be to prove a fact that the defendant has placed, or conceivably will place, in issue, or a fact that the statutory elements obligate the government to prove." (Internal quotation marks omitted.) *United States* v. *Latouf*, 132 F.3d 320, 328–29 (6th Cir. 1997). Thus, we disagree with the defendant's reliance on *United States* v. *Owens*, 424 F.3d 649 (7th Cir. 2005), in support of the proposition that the prior bad acts evidence was irrelevant because the defendant's intent was not at issue in this case. In *Owens*, the court concluded that prior bad acts evidence was inadmissible because that case involved only the general intent crime of bank robbery, and "where specific intent is not an essential element—as in the case of general intent crimes—evidence of past bad acts shall not be admitted to prove such intent unless the government has reason to believe that the defendant will place it in issue. . . . Thus, the absence of accident or mistake is not a matter in issue here unless [the defendant] made it one." (Citations omitted.) Id., 654. *Owens* is inapposite for two reasons. First, the defendant made accident an issue in this case by attributing the fire to James' smoking in the basement. Second, arson murder, arson in the first degree and attempted murder are specific intent crimes, for which the state is required to prove intent as part of its case-in-chief. See *State* v. *Lopez*, 280 Conn. 779, 814, 911 A.2d 1099 (2007) ("[a] verdict of guilty of attempted murder requires a finding of the specific intent to cause death" [internal quotation marks omitted]); *State* v. *Chasse*, 51 Conn. App. 345, 369, 721 A.2d 1212 (1998) ("the specific intent to damage or destroy a building is an essential element of the crimes of

F.3d 320, 328–29 (6th Cir. 1997); *State* v. *Baldwin*, supra, 224 Conn. 357–58; see also *United States* v. *Nickerson*, 606 F.2d 156, 159 (6th Cir.) (evidence that defendant had committed acts of arson in past admissible to prove intent with respect to charge of conspiracy to commit arson), cert. denied, 444 U.S. 994, 100 S. Ct. 528, 62 L. Ed. 2d 424 (1979); *State* v. *Garcia*, 743 A.2d 1038, 1052 (R.I. 2000) ("defendant's claim to have burned down a crackhead's house in the past as he urged his cohorts to retaliate for [his fellow gang member's] injuries revealed both his vengeful motive and his . . . preferred plan and intention to achieve his revenge via arson, and thus falls squarely within these exceptions").

It also was, as the trial court concluded, properly admitted for the closely related purpose of disproving the defendant's theory, founded on his April, 1999 statement; see footnote 9 of this opinion and the accompanying text; and advanced during his closing argument, namely, that the fire was caused accidentally by James' cigarettes.[18] See *United States* v. *Weddell*, 800 F.2d 1404,

---

first and second degree arson"), cert. denied, 247 Conn. 960, 723 A.2d 816 (1999); see also *State* v. *Dupree*, 196 Conn. 655, 663, 495 A.2d 691 ("Intent to cause death is not an element of the crime of arson murder. Arson murder has no mens rea requirement beyond that of an intention to commit the underlying crime of arson upon which the charge of arson murder is predicated."), cert. denied, 474 U.S. 951, 106 S. Ct. 318, 88 L. Ed. 2d 301 (1985).

[18] Thus, we disagree with the defendant's reliance in his reply brief and at oral argument before this court on *State* v. *Meehan*, supra, 260 Conn. 395–96, wherein we held inadmissible testimony that a police officer, charged with larceny for stealing a suspect's money during a search, previously had committed the same act with respect to another suspect. We concluded that the testimony did not "render it more or less likely that the defendant, during a subsequent, unrelated search . . . had the specific intent to appropriate the money in [that suspect's] possession. If believed, [the first suspect's] testimony would establish that the defendant had searched him and that, during the course of that search, the defendant had taken some of the money in [the first suspect's] possession. This evidence tends to suggest only the likelihood of the defendant's actions with respect to [the second suspect], namely, the likelihood that he also searched and took money from [the second suspect]. It does not, however, establish that he had the requisite state of mind when he engaged in that conduct." Id., 395. We also concluded that "this evidence was particularly prejudicial, despite the trial court's

1412 (5th Cir. 1986) (evidence that prior minor fire on defendants' premises was caused by arson was relevant to rebut "defense evidence that the [charged] fire was electrical in origin"); *State* v. *Allen*, 301 Or. 569, 577, 725 P.2d 331 (1986) ("evidence of the prior arson was relevant to [the] defendant's knowledge of how to start an arson fire and was also relevant to negate evidence that the fire was accidental or originated from an unknown source"); cf. *State* v. *Widdison*, 28 P.3d 1278, 1288 (Utah 2001) (uncharged misconduct evidence that defendant had abused her other children was not "admitted to demonstrate [the] defendant's character as a bad mother," but to prove that victim's fatal "injuries were not the result of accident, and that [the] defendant was the one who inflicted [her] injuries"). Indeed, the admissibility of this evidence to prove the defendant's intent does not depend on whether he actually set the trailer fire in West Virginia; his comments about wanting to set that fire, as well as his threats to Ramsey and remarks about having set fires for money, are equally probative of his intent in this case. See *State* v. *Garcia*, supra, 743 A.2d 1050 ("it was [the] defendant's utterance itself—not whether he in fact committed such a prior arson or was just boasting about having done so—that was relevant in proving [the] defendant's motive, his settled purpose, and his intent to commit the charged act of arson"). Accordingly, we conclude that the uncharged misconduct evidence was relevant both to prove the defendant's intent and to disprove the theory that the fire was accidental.[19]

limiting instructions, in light of the fact that the evidence not only suggested that the defendant, a police officer, had a propensity to abuse his authority, but also that he had a proclivity to do so during the course of a common and routine police practice in which he frequently was required to participate." Id., 396.

[19] As the Rhode Island Supreme Court has noted, "the line dividing prior-bad-act evidence offered to show a propensity to commit such acts and/or a defendant's bad character, and prior-bad-act evidence offered to show motive, intent, or for some other permissible purpose is both a fine one to draw and an even more difficult one for judges and juries to follow." *State*

Moving to the next step in the analysis, we disagree with the defendant's contention that the trial court abused its discretion in determining that the probative value of the uncharged misconduct evidence exceeded its prejudicial effect. Uncharged misconduct evidence has been held not unduly prejudicial when "the evidentiary substantiation of the vicious conduct, with which the defendant was charged, far outweighed, in severity, the character of his prior misconduct." *State* v. *Zubrowski,* 101 Conn. App. 379, 395, 921 A.2d 667 (2007), appeal dismissed, 289 Conn. 55, 956 A.2d 578 (2008); id., 395–96 (uncharged misconduct evidence of defendant's past physically and verbally abusive behavior toward his wife admissible to prove intent in murder case). Thus, it is significant that the prior misconduct evidence admitted involved only the defendant's actual, claimed or threatened damage of property for personal gain, as compared to the charged crime in the present case, which contemplated the intentional killing of a person for financial reasons.[20]

v. *Garcia,* supra, 743 A.2d 1052. It is, therefore, not surprising that other courts have excluded similar prior misconduct evidence in arson cases, one of which is relied on by the defendant herein. See *United States* v. *Varoudakis,* 233 F.3d 113, 120 (1st Cir. 2000) (evidence that defendant set his leased car on fire inadmissible as propensity evidence to prove motive for charges of arson and conspiracy to commit arson of his restaurant); *United States* v. *Utter,* 97 F.3d 509, 514–15 (11th Cir. 1996) (defendant's threat to "burn out" his tenant was improper propensity evidence in arson trial, and evidence of fire at another one of defendant's properties was improperly admitted because there was no evidence that it was arson). Recognizing the fine line between improper propensity evidence and admissible uncharged misconduct, we defer to the trial court's cautious relevance determination in this case.

[20] We disagree, then, with the defendant's reliance on *State* v. *Gilligan,* 92 Conn. 526, 103 A. 649 (1918), wherein a convalescent home owner was convicted of murdering one of her patients by arsenic poisoning. On appeal, this court concluded that the trial court had abused its discretion when, for purposes of proving malice and intent, as well as absence of accident or mistake, it admitted into evidence the fact that three of the home's other patients also had recently died of arsenic poisoning. Id., 536. We view the venerable *Gilligan* decision as confined to its facts, because it focuses largely on the unduly prejudicial impact of that uncharged misconduct evidence in

Indeed, the "care with which the [trial] court weighed the evidence and devised measures for reducing its prejudicial effect militates against a finding of abuse of discretion." (Internal quotation marks omitted.) Id., 396. The trial court's care in weighing the evidence is demonstrated by its exclusion of the most egregious and prejudicial uncharged misconduct pertaining to the defendant's comments about the financial benefits that would inure to his family from the death of his mother, the homicidal portion of his threat to Ramsey in the early 1990s, and the prior arson *conviction* involving the Otis Elevator Company. We also note that the trial court instructed the jury that its use of Ramsey's testimony was limited to determining only whether the fire was intentionally set, and that it could not consider her testimony for other purposes, including inferring that the defendant was a person of bad character.[21]

---

light of the fact that the state already had introduced ample evidence of absence of mistake or accident, including that the victim had received multiple large doses of arsenic, the defendant's delay in seeking medical attention and "unseemly haste" in getting rid of the body, the defendant's failure to notify the victim's relatives of his death, a loan of money from the victim to the defendant, and the defendant's impending need for the victim's room for another paying patient. Id., 536–37.

[21] Specifically, the trial court instructed the jury that "you have heard testimony from . . . Ramsey, a woman who was married to the defendant from 1981 to 1998. [Ramsey] was allowed to testify as to certain conduct she witnessed the defendant engage in, and certain statements made by the defendant relating to a fire that damaged the trailer that . . . Ramsey and the defendant lived in, in 1982 in West Virginia. You also heard testimony from . . . Ramsey concerning a statement she alleges the defendant made in the mid-1980s concerning other fires which the defendant claims he was involved in. And also from . . . Ramsey, you heard testimony concerning a threat she claims the defendant made to her in 1994 or 1995 to set a fire in . . . Ramsey's then West Virginia home. *I have allowed evidence of these alleged prior acts and statements solely for a limited purpose and the purpose is this; to support the state's claim that the fire at 95 Shawn Drive was intentionally set. Apart from this limited purpose, these alleged prior acts of the defendant cannot be considered by you for any other purpose, and may otherwise have no bearing on your determination of the charges against the defendant.* The defendant is not on trial for any conduct he may have engaged in or statements he may have made at these earlier times. In considering the testimony of . . . Ramsey, you can choose to [accept]

Moreover, this instruction was given only *after* the trial court already had made clear the state's burden of proving beyond a reasonable doubt the defendant's identity as the perpetrator of the crimes charged,[22] a requirement that could be satisfied independently of the prior misconduct evidence with the separate evidence putting the defendant at the scene of the fire with matches and the lighter. See *State* v. *Baldwin*, supra, 224 Conn. 358 (emphasizing limiting instructions and noting that admission of "prior misconduct evidence did little to undermine the defendant's posture at trial because it only became relevant once the jury determined that he had been in possession of the narcotics"); see also *State* v. *James G.*, 268 Conn. 382, 397–98, 844 A.2d 810 (2004) (limiting instructions about restricted purpose for which jury may consider uncharged misconduct evidence "serve to minimize any prejudicial effect that such evidence otherwise may have had" [internal quota-

it in whole or in part, or reject it in whole or in part just like you can choose to accept or reject any other evidence in the case. My allowing the evidence to be considered by you gives it no special weight. You cannot infer from this evidence that the defendant is a person of bad character, or that he has a criminal disposition. *You may consider this evidence only if you believe it, and then only to the extent that it aids you in determining whether the fire at Shawn Drive was accidentally or intentionally set.*

"On the other hand, to the extent you do not believe the evidence, or to the extent that you do accept the evidence, but do not conclude that it logically and rationally supports the state's claim that the fire at 95 Shawn Drive was intentionally set, then you may not consider that testimony for any purpose at all." (Emphasis added.)

[22] Specifically, the trial court instructed the jury that the "state has the burden of proving beyond a reasonable doubt that the defendant was the perpetrator of the crimes charged. Identification is a fact for you to decide taking into account all of the evidence that you have seen and heard in the course of the trial. In this regard, however, understand that the identification of the defendant may be proven solely by direct evidence, or solely by circumstantial evidence, or by a combination of both. You will also recall that there is no legal distinction between direct evidence and circumstantial evidence as far as the probative value of the evidence is concerned. Regardless of the type of evidence presented and relied upon, you must be satisfied beyond a reasonable doubt of the identity of the defendant as the one who committed the crimes charged."

tion marks omitted]). "[I]n the absence of evidence to the contrary, we presume that the jury properly followed those instructions." (Internal quotation marks omitted.) Id., 398. Accordingly, we conclude that the trial court did not abuse its discretion by admitting Ramsey's testimony about the defendant's past arson related misconduct.

## B

The defendant next claims that the trial court abused its discretion by denying his motion to strike Ramsey's testimony under the marital communications privilege adopted in *State* v. *Christian*, 267 Conn. 710, 841 A.2d 1158 (2004).[23] The defendant argues that his trial coun-

[23] "We note . . . that evidentiary privileges are governed by § 5-1 of the Connecticut Code of Evidence, which provides: 'Except as otherwise required by the constitution of the United States, the constitution of this state, the General Statutes or the Practice Book, privileges shall be governed by the principles of the common law.' The adverse spousal testimony privilege, which is codified at [General Statutes] § 54-84a, belongs to the 'witness spouse.' *State* v. *Saia*, 172 Conn. 37, 43, 372 A.2d 144 (1976). Under that privilege, the husband or wife of a criminal defendant has a privilege not to testify against his or her spouse in a criminal proceeding, provided that the couple is married at the time of trial." *State* v. *Christian*, supra, 267 Conn. 725. In contrast, the broader marital communications privilege, which may be invoked by either spouse, is based on "the protection of marital confidences, regarded as so essential to the preservation of the marriage relationship as to outweigh the disadvantages to the administration of justice which the privilege entails." (Internal quotation marks omitted.) Id., 728. "[It] permits an individual to prevent his or her spouse or former spouse from testifying as to any confidential communication made by the individual to the spouse during their marriage." Id., 731.

To be subject to the marital communications privilege, a statement must be: (1) a communication; (2) made during a legally valid marriage, irrespective of difficulties; and (3) confidential in nature. See id., 731–34. "Once the marital communications privilege has attached, moreover, it continues to survive even after the marriage has ended." Id., 733. Furthermore, "marital communications are presumed to be confidential, [but] that presumption may be overcome by proof of facts showing that they were not intended to be private." (Internal quotation marks omitted.) Id., 737. To determine whether a statement is confidential, we "apply an objective test, wherein a communication is confidential if, at the time of the communication, the communicator could have had a reasonable expectation of confidentiality." Id., 738.

sel's initial failure to object to the testimony was not a waiver of the privilege because it was inadvertent and not tactical, and that the trial court improperly concluded that the privilege did not apply on the ground that the statements pertained to a joint criminal enterprise between Ramsey and the defendant. In response, the state relies on *State* v. *Saia*, 172 Conn. 37, 372 A.2d 144 (1976), and argues that the defendant waived the privilege by failing to object contemporaneously, which also renders this claim unreviewable on appeal. The state also contends that the testimony would in any event have been admitted over a timely assertion of the privilege, because Ramsey's enjoyment of the fruits of the defendant's prior arson activities rendered the privilege inapplicable to the communications. We agree with the state, and conclude that the defendant waived the marital privilege by failing to make a contemporaneous objection at trial.

The record reveals the following additional relevant facts and procedural history. The day after Ramsey testified, the defendant moved to strike her testimony about the defendant's plan to burn down their trailer for insurance money, as well as his claims to have burned property for money, as subject to the marital privilege under *State* v. *Christian*, supra, 267 Conn. 710, and *State* v. *Littlejohn*, 199 Conn. 631, 508 A.2d 1376 (1986). The defendant argued that the claim of privilege was not waived, notwithstanding his failure to object to that testimony the previous day, which he emphasized was inadvertent and not tactical. The defendant also moved for a mistrial. In response, the state argued that the defendant had waived the privilege claim under *State* v. *Saia*, supra, 172 Conn. 37, by failing to take advantage of his two opportunities to raise the privilege claim, namely, when Ramsey testified both during voir dire and before the jury. The state also contended that striking the testimony would be "grossly prejudicial" to its case because it would cause the jury

to speculate about why it was stricken. The trial court denied the motion for a mistrial and the motion to strike, but reserved the right to reconsider that ruling pending further review of the relevant case law.

After reviewing the jury instructions the following day, the trial court returned to the topic of the defendant's motion to strike. The defendant argued that counsel's performance potentially was ineffective because of his failure to raise the privilege issue sooner, and that it would be wasteful for the case to have to be retried following postconviction proceedings. The state reiterated its waiver arguments and contended that the privilege might not apply because of a breakdown in the relationship or the presence of a third party, namely, the defendant's father. The trial court concluded that this court's decision in *Saia* was controlling as a "procedural" matter as standing for the "proposition that the defendant having failed to raise an objection under confidential communications privilege, cannot later be heard to seek to strike the testimony especially when it was the subject of extensive, direct and cross-examination, both during testimony before the jury and in pretrial hearings." The trial court also stated that, even if the defendant had properly made a claim of privilege, it would have overruled the objection anyway.[24]

---

[24] The trial court stated that, in its view, the statements at issue in this case were distinct from those in *Christian* or *Littlejohn* because they did not involve the defendant "really opening up his heart and confessing in a sense in a confidential way to a spouse of prior criminal activity . . . ." The trial court concluded that the statements were not privileged with respect to the trailer fire in the 1980s, because much of that information, namely, that the trailer was run down, insured and expensive to fix, and their receipt and use of insurance money, was not a privileged communication. It also concluded that the defendant's statement of his intent to burn down the trailer pertained to a future crime, which made Ramsey a coconspirator in the defendant's criminal actions, and rendered the communications not privileged. The court considered more difficult the question of whether the privilege applied to the defendant's statement that he had set fires for money, but also concluded that this statement was part of an ongoing criminal enterprise not subject to the privilege.

We agree with the state and the trial court that this court's decision in *State* v. *Saia*, supra, 172 Conn. 37, is controlling. In that case, the trial court denied the defendant's motion to strike, made after his wife testified several times both on direct and cross-examination that he had admitted to her several times that he had killed the victim.[25] Id., 44. This court concluded that the defendant had waived his claim that his admissions to his wife were subject to the marital communications privilege because a "party consenting that a witness testify to a matter on direct and cross-examination may not, thereafter, have the evidence struck out on the ground that it related to a confidential or privileged communication." Id.; accord *Cooper* v. *District Court*, 133 P.3d 692, 718–19 (Alaska App. 2006) (claim of psychotherapist-patient privilege waived when raised later in proceeding, rather than by "contemporaneous objection"); *Woodel* v. *State*, 804 So. 2d 316, 323 (Fla. 2001) (privilege waived when defendant "stood silent for two days after the prosecutor commented about the marital communication"); *State* v. *Clark*, 296 N.W.2d 372, 376 (Minn. 1980) ("[s]ince the defendant waived the privilege in [his first trial] by failing to object, and the information was made public, there remains no 'confidence' to protect—no purpose to serve by exclusion of the same evidence in the current proceeding"); *State* v. *Ospina*, 239 N.J. Super. 645, 653–54, 571 A.2d 1373 (App. Div.) (late assertion of marital privilege, regardless of reason, including failure of defense counsel to recognize issue, "was sufficient cause to bar assertion of

---

[25] Specifically, the court noted "[t]hat the defendant, without objection, consented to repeated testimony by [his wife] concerning conversations with her husband in which he admitted killing [the victim]. [The wife] was questioned on this subject several times, both on direct and cross-examination. Nor was a claim of confidential communication raised when [the wife] had earlier testified that the defendant told her the hill on which [the victim] was shot would be a good spot if he, the defendant, were to kill someone." *State* v. *Saia*, supra, 172 Conn. 44.

the privilege"), cert. denied, 127 N.J. 321, 604 A.2d 597 (1990); but see *State* v. *Penkaty*, 708 N.W.2d 185, 203–205 (Minn. 2006) (finding plain error resulting from defense counsel's apparent misunderstanding of scope of marital privilege statute, which meant that failure to object to wife's testimony was not intelligent waiver of privilege).

The defendant argues, however, that *Saia* is inapposite because the waiver in this case was not knowing and voluntary since it was attributable to an admitted error by counsel. The defendant further contends that *Saia* is not controlling because that decision does not mention any facts that suggest counsel's reason for failing to assert the privilege. We disagree. The defendant's statement to the contrary notwithstanding, this argument essentially amounts to an ineffective assistance of counsel claim, which, "[a]lmost without exception, we have required . . . be raised by way of habeas corpus, rather than by direct appeal, because of the need for a full evidentiary record for such [a] claim. . . . Absent the evidentiary hearing available in the collateral action, review in this court of the ineffective assistance claim is at best difficult and sometimes impossible. The evidentiary hearing provides the trial court with the evidence which is often necessary to evaluate the competency of the defense and the harmfulness of any incompetency." (Internal quotation marks omitted.) *State* v. *Greene*, 274 Conn. 134, 151, 874 A.2d 750 (2005), cert. denied, 548 U.S. 926, 126 S. Ct. 2981, 165 L. Ed. 2d 988 (2006). Thus, we conclude that the defendant waived his claim that his statements to Ramsey were privileged by his failure to object to them contemporaneously, despite his ample opportunity to do so during voir dire and before the jury.

## II

Finally, we turn to the defendant's claim that the trial court improperly permitted McGurk to testify that the

fire was set intentionally. The defendant contends that McGurk's testimony was improper opinion testimony addressing the ultimate issue in the case in violation of § 7-3 (a) of the Connecticut Code of Evidence, and it was not necessary to aid the jury's determination about whether the fire was intentionally set because it was not derived from his expert scientific knowledge or skill. The defendant also asks us to adopt a bright line rule followed by the courts of New York and Virginia, and conclude that expert opinion about whether a fire has been set intentionally is per se inadmissible in an arson case. In response, the state contends that the trial court properly admitted McGurk's opinion testimony because the jury might reasonably have needed it to evaluate the viability of the defendant's theory that his son had started the fire accidentally. The state also contends that, even if the admission of McGurk's opinion testimony was improper, it was harmless error not requiring reversal. We agree with the defendant that the admission of the ultimate issue opinion evidence in the present case was improper, but we agree with the state that the impropriety was harmless.

The record reveals the following additional relevant facts and procedural history. McGurk testified on direct examination that Lennon had provided him with additional information gleaned from his interviews with the defendant, James and Atkins, which caused him to change his conclusion with respect to the cause of the fire. Over the defendant's objection on the ground that the question called for an opinion as to the ultimate issue in the case, which preserved this issue for appeal, McGurk then testified: "Based on the information that was provided to me by Detective Lennon, from the interviews he had conducted, I felt that the fire had been intentionally set." McGurk then testified that those interviews also eliminated accidental ignition as a cause of the fire.

Section 7-3 (a) of the Connecticut Code of Evidence provides: "Testimony in the form of an opinion is inadmissible if it embraces an ultimate issue to be decided by the trier of fact, except that, other than as provided in subsection (b), an expert witness may give an opinion that embraces an ultimate issue *where the trier of fact needs expert assistance in deciding the issue.*" (Emphasis added.) See also Conn. Code Evid. § 7-4 (a) ("[a]n expert may testify in the form of an opinion and give reasons therefor, provided sufficient facts are shown as the foundation for the expert's opinion"). Under the Code of Evidence, the "trial court has wide discretion in ruling on the qualification of expert witnesses and the admissibility of their opinions. . . . The court's decision is not to be disturbed unless [its] discretion has been abused, or the error is clear and involves a misconception of the law. . . . Generally, expert testimony is admissible if (1) the witness has a special skill or knowledge directly applicable to a matter in issue, (2) that skill or knowledge is not common to the average person, and (3) the testimony would be helpful to the court or jury in considering the issues. . . .

"The determination of the credibility of a witness is solely the function of the jury. . . . It is the trier of fact which determines the credibility of witnesses and the weight to be accorded their testimony. . . . Expert witnesses cannot be permitted to invade the province of the jury by testifying as to the credibility of a particular witness or the truthfulness of a particular witness' claims. . . . An expert witness ordinarily may not express an opinion on an ultimate issue of fact, which must be decided by the trier of fact. . . . Experts can [however] sometimes give an opinion on an ultimate issue where the trier, in order to make intelligent findings, needs expert assistance on the precise question on which it must pass." (Citations omitted; internal quotation marks omitted.) *State* v. *Iban C.*, 275 Conn.

624, 634–35, 881 A.2d 1005 (2005). Thus, expert opinion as to the ultimate issue in a case is admissible only when necessary for the trier of fact to make sense of the proffered evidence, rendering the "situation . . . of such a nature as to require an expert to express an opinion on the precise question upon which the court ultimately had to pass." *State* v. *Vilalastra*, 207 Conn. 35, 41, 540 A.2d 42 (1988). "[A]n ultimate issue [is] one that cannot reasonably be separated from the essence of the matter to be decided [by the trier of fact]." (Internal quotation marks omitted.) *State* v. *Finan*, 275 Conn. 60, 66, 881 A.2d 187 (2005).

Our recent decision in *State* v. *Iban C.*, supra, 275 Conn. 624, is instructive. In that case, the defendant claimed that the trial court improperly had admitted the opinion of an expert witness, in the form of both her testimony and a portion of her written report, that her diagnosis with respect to the victim therein was "[c]hild [s]exual [a]buse," which was the ultimate issue in the case because one of the defendant's "central" theories was that the alleged abuse had never taken place. Id., 631–32. Specifically, the expert testified that "the majority of the [physical] examinations of children who have been sexually abused yield normal results"; id., 632; but that she had diagnosed child sexual abuse based "on the concerns expressed and allegations made by the victim's mother at the time of the physical examination, and on the interview of the victim conducted by the investigation team." Id., 633.

We concluded "that the trial court abused its discretion by admitting into evidence [the expert's] diagnosis of '[c]hild [s]exual [a]buse' via her unredacted written report and her direct testimony. First, because [the expert] did not find any physical evidence of a sexual assault, in order for the jury to find the defendant guilty of counts three and four of the information, it had to find the victim's account of both the bedroom and the

bathroom incidents to be credible. In short, the victim's credibility was central to the state's case. Indeed, by [the expert's] own admission, her diagnosis depended on a belief in this same credibility because her ultimate assessment was based almost entirely on the history provided by the victim and the victim's mother to the investigation team. [The expert's] diagnosis of child sexual abuse, therefore, necessarily endorsed the victim's credibility, and functioned as an opinion as to whether the victim's claims were truthful. Additionally, [the expert's] report and statements were not limited to the conclusion that the physical evidence and the victim's behavior were consistent with that of other victims of sexual abuse. Rather, they provided the jury with an opinion that the victim had suffered sexual abuse in the present case. Ultimately, evaluating the victim's credibility and determining whether child sexual abuse occurred were tasks for the jury, not [the expert] as an expert witness." Id., 636–37.

Indeed, we rejected the state's argument under § 7-3 (a) of the Connecticut Code of Evidence that the "challenged evidence was . . . helpful to the jury in deciding the precise question on which it had to pass." Id., 637. We concluded that, although testimony that a victim's injuries are consistent with sexual abuse is admissible, admission of an expert's testimony and "written report stating a diagnosis of sexual abuse, effectively offered an expert opinion that this particular victim had in fact suffered sexual abuse"; id., 639; and that, "[w]hen viewed in isolation, [the expert's] diagnosis of '[c]hild [s]exual [a]buse' did not provide any assistance to the jury in understanding the facts presented at trial or the issue on which it needed to deliberate. To find the defendant guilty of risk of injury to a child, the jury had to find that the defendant 'ha[d] contact with the intimate parts . . . of a child . . . in a sexual and indecent manner likely to impair the health or mor-

als of such child . . . .' General Statutes § 53-21 (a) (2). In light of the case history and the victim's testimony offered into evidence at trial, this type of assessment was well within the jurors' capabilities and understanding, and did not require a separate conclusion from [the expert] that sexual abuse had taken place. It is well recognized that testimony on matters which are not beyond the ken of the average juror does not qualify as admissible expert testimony. . . . When inferences or conclusions are so obvious that they could be as easily drawn by the jury as the expert from the evidence, expert testimony regarding such inferences is inadmissible."[26] (Citation omitted.) *State* v. *Iban C.*, supra, 275 Conn. 639; see also *State* v. *Campbell*, 225 Conn. 650, 656–57, 626 A.2d 287 (1993) (police detective could testify about patterns common to drug sales, but it was improper for him "to testify to his opinion on the ultimate fact of whether the defendant possessed the narcotics with the intent to sell or for his personal consumption"); *State* v. *Vilalastra*, supra, 207 Conn. 45 (state improperly asked police detective whether in his expert opinion defendant possessed illegal drugs for sale or consumption).

Inasmuch as the defendant's theory was that the fire was caused accidentally either by the cigar found in the clothing pile or by James' smoking, the cause of the fire was very much an ultimate issue to be decided in the present case. Although we decline the defendant's invitation to adopt a per se rule barring all ultimate issue testimony in arson cases,[27] we nevertheless con-

---

[26] We concluded, however, that the improper admission of this expert testimony was harmless with respect to one of the two risk of injury convictions, which did not rest solely on the victim's credibility, but also was supported by two confessions by the defendant. See *State* v. *Iban C.*, supra, 275 Conn. 645–46.

[27] The defendant advocates in favor of the rule, followed by the courts of New York and Virginia, that precludes an expert witness from giving an opinion about the ultimate issue in arson cases, namely, whether the fire was intentionally set. See *People* v. *Grutz*, 212 N.Y. 72, 81–82, 105 N.E. 843

clude that the trial court improperly admitted McGurk's specific conclusion that the fire was intentionally set. In contrast to the testimony of McGurk and Paola, which took the court and the jury through their painstaking analysis of the fire scene to conclude that the fire was caused by human hands *in some manner*, McGurk's ultimate conclusion that the fire was intentionally set was based not on that scientific process, but rather, on the nonscientific information he learned from Lennon's investigation. Put differently, McGurk's ultimate conclusion that the fire was intentionally set was founded not on his scientific investigation, but rather, on an assessment of the defendant's credibility with respect to his explanation of how the fire started, as well as the other circumstantial evidence proffered by the state, such as the defendant's motive and history

(1914); *People* v. *Capobianco*, 176 App. Div. 2d 815, 816, 575 N.Y.S.2d 140, appeal denied, 79 N.Y.2d 825, 588 N.E.2d 103, 580 N.Y.S.2d 205 (1991); *Ramsey* v. *Commonwealth*, 200 Va. 245, 249–50, 105 S.E.2d 155 (1958); *Callahan* v. *Commonwealth*, 8 Va. App. 135, 139–40, 379 S.E.2d 476 (1989). This per se rule is incompatible with § 7-3 (a) of the Connecticut Code of Evidence, which explicitly permits an expert witness to "give an opinion that embraces an ultimate issue where the trier of fact needs expert assistance in deciding the issue." We also note that the New York and Virginia arson rule is a distinct minority position that stands in stark contrast to the "modern trend," which is "to abolish the ultimate issue prohibition"; 1 P. Giannelli & E. Imwinkelried, Scientific Evidence (4th Ed. 2007) § 5.07, p. 321; including in arson cases wherein expert assistance is truly necessary to the resolution of the ultimate issue. See *Henderson* v. *State*, 715 So. 2d 863, 865 (Ala. Crim. App. 1997); *Oxenberg* v. *State*, 362 P.2d 893, 900 (Alaska), cert. denied, 368 U.S. 56, 82 S. Ct. 189, 7 L. Ed. 2d 128 (1961); *People* v. *Price*, 176 Ill. App. 3d 831, 839, 531 N.E.2d 901 (1988); *Belser* v. *State*, 727 N.E.2d 457, 463 (Ind. App.), appeal denied, 741 N.E.2d 1250 (Ind. 2000); *Commonwealth* v. *Harris*, 1 Mass. App. 265, 268, 295 N.E.2d 687, aff'd, 364 Mass. 236, 303 N.E.2d 115 (1973); *State* v. *Paglino*, 319 S.W.2d 613, 623 (Mo. 1958); *State* v. *Hales*, 344 N.C. 419, 424–25, 474 S.E.2d 328 (1996); *Moore* v. *State*, 761 P.2d 866, 873–74 (Okla. Crim. App. 1988); *Commonwealth* v. *Nasuti*, 385 Pa. 436, 443–44, 123 A.2d 435 (1956); *State* v. *Alden*, 73 Wash. 2d 360, 361, 438 P.2d 620 (1968); cf. *Haynes* v. *Allstate Ins. Co.*, 749 F.2d 1474, 1477 n.5 (11th Cir. 1985) (per curiam) (expert may testify in insurance coverage dispute that fire was intentionally set); *Rutledge* v. *St. Paul Fire & Marine Ins. Co.*, 286 S.C. 360, 367, 334 S.E.2d 131 (App. 1985) (same).

of starting fires. Allowing McGurk to testify as to this conclusion, therefore, improperly invaded the province of the jury. Accordingly, we conclude that the trial court abused its discretion when it permitted McGurk to give an opinion about the ultimate issue in this case.

The improper admission of the expert opinion testimony does not, however, require the reversal of the defendant's convictions. "When an improper evidentiary ruling is not constitutional in nature, the defendant bears the burden of demonstrating that the error was harmful." (Internal quotation marks omitted.) *State* v. *Sawyer*, supra, 279 Conn. 352. "[W]hether [the improper admission of a witness' testimony] is harmless in a particular case depends upon a number of factors, such as the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case. . . . Most importantly, we must examine the impact of the [improperly admitted] evidence on the trier of fact and the result of the trial." (Internal quotation marks omitted.) Id., 358. "[T]he proper standard for determining whether an erroneous evidentiary ruling is harmless should be whether the jury's verdict was substantially swayed by the error." Id., 357. Accordingly, "a nonconstitutional error is harmless when an appellate court has a fair assurance that the error did not substantially affect the verdict." (Internal quotation marks omitted.) Id.

Having reviewed the record in the present case, we have more than a fair assurance that the error did not substantially affect the verdict, notwithstanding the fact that the evidence against the defendant was largely circumstantial, because "[c]ircumstantial evidence has the same probative force as direct evidence and [i]t is

not one fact, but the cumulative impact of a multitude of facts which establishes guilt . . . ." (Internal quotation marks omitted.) *State* v. *Farnum*, 275 Conn. 26, 36, 878 A.2d 1095 (2005); see also *Goldstar Medical Services, Inc.* v. *Dept. of Social Services*, 288 Conn. 790, 834, 955 A.2d 15 (2008) ("[T]here is no distinction between direct and circumstantial evidence [so] far as probative force is concerned . . . . In fact, circumstantial evidence may be more certain, satisfying and persuasive than direct evidence." [Internal quotation marks omitted.]). We recognize that McGurk's testimony, along with that of Paola, clearly was important to the state's case because it established that the fire was in some way the product of human hands, and did not result from mechanical, thermonuclear or providential causes. McGurk's improperly admitted ultimate issue conclusion was, however, not as significant given the enormity of the circumstantial evidence against the defendant, namely, the evidence of his motive, his opportunity, his knowledge that the fire started in the basement, his possession of fire starting supplies on the morning of the fire, his intent as shown through his prior bad acts, and the uncontroverted and properly admitted expert evidence that refuted his attempt to blame the fire on James' smoking. Moreover, the defendant had ample opportunity to cross-examine McGurk about his investigation, and emphasized during summations that McGurk had classified the fire as intentional despite the existence of a National Fire Protection Association guideline cautioning investigators against drawing such conclusions in the absence of physical evidence of an incendiary fire. This case is not, therefore, a credibility contest characterized by equivocal evidence, a category of cases that is far more prone to harmful error.[28] Cf. *State* v. *Arroyo*, 284 Conn. 597,

---

[28] We also note that the defendant had the opportunity to emphasize during summations that it was the responsibility of the jury to make that conclusion, a point echoed by the trial court during its charge.

614–15, 935 A.2d 975 (2007) (failure to give third party culpability instruction harmful when case was "not . . . very strong" because medical evidence was "equivocal" and case hinged on victim's testimony and out-of-court statements). Finally, the trial court emphasized during its charge that the experts' conclusions were not binding on the jury, which could disregard them either in whole or in part. Accordingly, we have more than the requisite fair assurance that the defendant has not proven that the improper admission of McGurk's ultimate issue opinion substantially affected the jury's verdict.

The judgment is affirmed.

In this opinion the other justices concurred.