******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

BISHOP, J., dissenting. In 1990, noted scholar Professor Edward J. Imwinkelried[1] wrote that the admissibility of uncharged misconduct evidence is the single most important issue in contemporary law. While I am not gifted with such an encyclopedic understanding of the history of the law, it is evident that the issue of whether evidence of prior misconduct should be admitted against a defendant in a criminal trial continues to vex our courts.[2] This difficult case fits Imwinkelried's profile of cases involving this most important issue.

While I take no issue with the majority's recitation of facts from the underlying trial, I note only that many facts relating to the identification of the defendant, Marcello E., as the assailant and facts relating to his behavior on the day of the assault were contested at trial. The jury could, and apparently did, accept the facts as presented by the state.

Prior to trial, the defendant filed a motion for disclosure of uncharged misconduct. On October 31, 2019, the court held a hearing on the admissibility of the prior uncharged misconduct evidence. The defendant asked the court to exclude, at trial, any evidence of the defendant's prior violence toward the victim. Before the trial evidence started, the court indicated that the state would be permitted to introduce the testimony of the victim that, two and three years before the assault at issue, the defendant had punched her in the face.[3]

At trial, the victim testified that, in 2008, three years before the assault in question, while she and the defendant were living together, they had an argument during which she "asked [the defendant] to leave and it became verbal and then it became physical." The prosecutor then asked: "And that was an argument where he eventually hit you in that incident. Correct?" The victim responded, "[y]es." The victim also testified to an incident in 2009 when she and the defendant were living together in Hartford. The victim testified that she and the defendant again got into an argument. In her answer to the prosecutor's question of whether he had punched her in the face on that day, the victim said, "[y]es."

The majority has concluded that this evidence of the defendant's prior misconduct involving the victim was admissible because it was relevant to prove intent, more probative than prejudicial, and that the defendant was not harmed by its admission. Respectfully, I disagree. I believe, instead, that the evidence of the defendant's prior misconduct was not relevant to prove the intent of the assailant to attack and stab the victim multiple times with a knife or the assailant's intent to thereby cause her serious physical injury. Rather, I believe, the only purpose and likely effect of this evidence was to

improperly demonstrate to the jury that the defendant had the propensity to commit acts of domestic violence against the victim.[4] Additionally, and contrary to the conclusion reached by the majority, I believe this evidence was harmful to the defense. For these reasons, I respectfully dissent.

As the majority has accurately reported, § 4-5 of the Connecticut Code of Evidence generally prohibits the admission of evidence of prior misconduct to prove the bad character, propensity, or criminal tendency of the defendant, with certain exceptions. One of those exceptions, the one relied on in the case at hand, is that such evidence may be admissible to prove the defendant's intent to commit the crime with which he is charged. But such evidence must be both relevant and material to an issue in the case. In the case at hand, I believe it was neither.

Section 4-1 of the Connecticut Code of Evidence defines relevant evidence as "evidence having any tendency to make the existence of any fact that is material to the determination of the proceeding more probable or less probable than it would be without the evidence." It is significant that proof of relevancy requires, as well, that the proffered evidence be material and, "[t]he materiality of evidence turns upon what is at issue in the case, which generally will be determined by the pleadings and the applicable substantive law." Conn. Code Evid. § 4-1, commentary.

At trial in this matter, the prior misconduct of the defendant was purportedly admitted for the sole purpose of proving his specific intent to commit the crime of assault in the first degree in violation of General Statutes § 53a-59 (a), which provides in relevant part that a person is guilty of assault in the first degree when, "(1) [w]ith intent to cause serious physical injury to another person, he causes such injury to such person . . . by means of a deadly weapon or dangerous instrument . . . ." Thus, the state was required to prove that the assailant assaulted the victim with the specific intent to cause serious physical injuries.

At the outset, I note that our Supreme Court in the venerable decision of *State* v. *Gilligan*, 92 Conn. 526, 103 A. 649 (1918), held that evidence of similar but unconnected crimes must be excluded because it violates the rules of policy that forbids the state initially to attack the character of the accused and that bad character may not be proved by particular acts.[5] I believe, respectfully, that the overarching language of *Gilligan* sets the table for the discussion of the admission of prior misconduct evidence in a criminal trial.

In the matter at hand, the prior misconduct evidence should have been excluded as irrelevant and immaterial to the issue of intent for separate but related reasons.

First, the evidence of the defendant's prior miscon-

duct was irrelevant and immaterial to prove the assailant's intent to cause the victim serious physical harm because such an intent was evident from the nature of the attack itself and was not contested at trial. Additionally, this evidence was irrelevant and immaterial because of the important dissimilarity between the prior incidents and the assault for which the defendant was on trial.

There was no dispute during the trial of this matter as to the issue of intent. The defense made no suggestion that the assailant struck the victim accidently or by mistake or that the assailant did not intend to cause the victim serious physical injury. In short, the state's evidence that the assailant attacked the victim with a knife and stabbed her multiple times was more than adequate evidence of the intent the state was required to prove to secure a conviction for the crime of assault in the first degree. Previously, this court has stated: "Intent is generally proven by circumstantial evidence because direct evidence of the accused's state of mind is rarely available. . . . Therefore, intent is often inferred from conduct . . . and from the cumulative effect of the circumstantial evidence and the rational inferences drawn therefrom. . . . It is axiomatic that a factfinder may infer an intent to cause serious physical injury from circumstantial evidence such as the type of weapon used, the manner in which it was used, the type of wound inflicted and the events leading up to and immediately following the incident." (Internal quotation marks omitted.) *State* v. *Vasquez*, 68 Conn. App. 194, 207, 792 A.2d 856 (2002); accord *State* v. *Madagoski*, 59 Conn. App. 394, 399–400, 757 A.2d 47 (2000), cert. denied, 255 Conn. 924, 767 A.2d 100 (2001). Additionally, it is axiomatic that, in assessing the intent of an assailant, a jury may infer that a defendant intends the natural consequences of his voluntary act. See, e.g., *State* v. *Pagan*, 158 Conn. App. 620, 628, 119 A.3d 1259, cert. denied, 319 Conn. 909, 123 A.3d 438 (2015). The court's charge to the jury in this matter was in accord with these basic tenets.

Also, the prosecutor argued to the jury in closing argument that the significant injuries to the victim were sufficient to establish the defendant's specific intent to cause serious physical injury to the victim.

In sum, on this point, I believe that the admission of the prior assaults against the victim by the defendant were not relevant to prove that the defendant had the specific intent to stab her and cause her serious physical injury, as required by the applicable statute, because the act itself was ample proof of the assailant's intent in this regard.

Recently, our Supreme Court revisited the question of whether an element must be genuinely at issue in order for evidence of prior misconduct to be admissible at trial. See *State* v. *Juan J.*, 344 Conn. 1, 4–5, 276 A.3d

935 (2022). In *Juan J.*, the court concluded that, "in a general intent crime case, in which the theory of defense is that the conduct did not occur at all, rather than a theory of defense in which the conduct occurred unintentionally, uncharged misconduct is irrelevant and inadmissible to prove intent." Id.[6] The court in *Juan J.* "noted the fine line between using uncharged misconduct to prove intent and using it to show the defendant's bad character or propensity to commit the crime charged. . . . The risk that the evidence will be used improperly is particularly high when the uncharged misconduct is 'extrinsic,' meaning, separate and distinct from the crime charged, because the uncharged misconduct 'is practically indistinguishable from prohibited propensity evidence. Uncharged misconduct may logically be used to rebut a claim of mistake or no knowledge . . . but to use misconduct at one time to prove an intent to do the same thing at another time borders on the forbidden theme of "once a thief always a thief." . . . E. Prescott, Tait's Handbook of Connecticut Evidence (6th Ed. 2019) § 4.15.6, p. 176; see also *State* v. *Conroy*, 194 Conn. 623, 626, 484 A.2d 448 (1984) ('[E]vidence of similar but unconnected crimes is generally not admissible to prove a criminal defendant's guilt. Such evidence can show no more than the defendant's bad character or an abstract disposition to commit a crime; it provides no proof of guilt of the specific offense in question.')." (Citation omitted.) *State* v. *Juan J.*, supra, 20. In light of these concerns, the state's introduction of uncharged misconduct is properly limited to cases in which the evidence is needed to "prove a fact that the defendant has placed, or conceivably will place, in issue, or a fact that the statutory elements obligate the government to prove." (Internal quotation marks omitted.) Id.

While I acknowledge that *Juan J.* involved a crime of general intent, I believe the court's reasoning in *Juan J.* is equally applicable to the case at hand because the defendant, in this instance, did not dispute any aspects of the crime itself, including the assailant's specific intent; instead, he presented an alibi defense that he was not present while the attack took place. In my view, respectfully, the nature of the defense in the case at hand makes irrelevant not only the issue of the attacker's intent to stab the victim but his intent to cause her serious physical harm. Accordingly, and contrary to the majority's assertion, I believe the reasoning of *Juan J.* is directly applicable to the underlying facts at hand and buttresses the defendant's claim that evidence of his prior misconduct incorrectly was admitted into evidence.

I am aware, of course, of earlier decisional law in Connecticut that prior instances of misconduct may be admitted to prove intent even though intent may not be a contested issue, if specific intent must be proven by the state and if the prior acts are sufficiently similar

to the crime at issue.

In issuing its ruling permitting the state to offer the uncharged misconduct evidence, the trial court specifically relied on *State* v. *Anthony L.*, 179 Conn. App. 512, 525, 179 A.3d 1278, cert. denied, 328 Conn. 918, 181 A.3d 91 (2018), and *State* v. *Morales*, 164 Conn. App. 143, 180, 136 A.3d 278, cert. denied, 321 Conn. 916, 136 A.3d 1275 (2016), in support of its decision to permit the state to adduce evidence of the defendant's past acts of violence against the victim. Although I agree that the cases cited by the trial court appear facially to support the court's reasoning, there are also significant legal and factual differences between those cases and the facts at hand in this case.[7] In *Anthony L.*, the defendant was convicted of sexual assault in the first degree, risk of injury to a child, and sexual assault in the third degree. There, the state was permitted to introduce evidence that the defendant had sexually assaulted the same victim on dates earlier than the time frame charged in order to prove his intent. *State* v. *Anthony L.*, supra, 523. This court determined on appeal that the admission of the prior misconduct evidence was not an abuse of discretion. Id., 527. In part, this court's reasoning on review was that the defendant's prior uncharged sexual misconduct "was of the same nature as the misconduct charged"; id., 526; and thereby demonstrated the defendant's sexual interest in the minor victim and, accordingly, was sufficiently material and relevant on the issue of the defendant's intent. Id., 525–26. But there is no such similarity in the present case between the prior acts of misconduct and the facts of the case at hand.

In *Morales*, also cited by the trial court, the defendant was convicted of strangulation in the second degree, unlawful restraint in the first degree, threatening in the second degree, and assault in the third degree. The trial court in *Morales* permitted the state to elicit evidence of a prior threat by the defendant to the victim as evidence of his specific intent as to the charge of threatening in the second degree even though the defendant, on appeal, asserted that there was no genuine issue of intent at trial. *State* v. *Morales*, supra, 164 Conn. App. 177. But, unlike the incidents of prior misconduct at issue in the present case, the incidents in *Morales* were strikingly similar. The victim testified that in the prior incident the defendant had held a knife to her while threatening her—behavior nearly identical to the conduct for which the defendant was charged. Id., 173. On appeal, the defendant claimed that the prior misconduct evidence should not have been admitted because there was no genuine issue regarding intent. He argued that evidence of the prior threat was immaterial because he had implicitly conceded the issue of intent by denying that he had engaged in the behavior. Id., 177–78. In rejecting the defendant's argument, the court opined: "[I]ntent, or any other essential element of a crime, is

always at issue unless directly and explicitly admitted before the trier of fact. . . . [The] prosecution's burden to prove every element of [a] crime is not relieved by a defendant's tactical decision not to contest an essential element of the offense . . . ." (Citations omitted; internal quotation marks omitted.) Id.

I believe that, unlike the prior misconduct evidence in *Anthony L.* and *Morales*, the evidence of the defendant's prior attacks on the victim was not material because of the dissimilarity between these prior incidents and the assault for which the defendant was on trial. Neither prior incident demonstrated the defendant's intent to assault the victim with a knife or the intent to cause her serious physical injury. It is also noteworthy that, in both prior acts involving the defendant and the victim, the violence ensued from a heated argument between them and did not involve the use of any extrinsic instrumentality, but, in the case at hand, the trial evidence indicates that the attack on the victim was sudden and did not follow any heated dispute between the parties. Indeed, the victim testified that, since their separation approximately two years before the incident in question, she and the defendant had nothing to do with each other and that, when she went to the home of the defendant's mother to pick up their daughter, S, after school, she avoided contact with the defendant, who also lived there. Accordingly, there was no evidence of any interactions, let alone arguments or heated exchanges between the victim and the defendant for a period of two years leading up to the assault for which the defendant was tried. But similarity between the prior misconduct and the crime charged at trial must be sufficient to make evidence of the prior misconduct probative of the defendant's intent. In *State* v. *Chyung*, 325 Conn. 236, 263–64, 157 A.3d 628 (2017), our Supreme Court approved of the admission of evidence of prior misconduct because there were "substantial similarities" between the prior misconduct and the charged crimes, including the use of a firearm in both instances.

In sum, the similarity between the prior incidents and the assault at issue must bear sufficient commonalities to be probative of the defendant's intent to commit the crime in question, a requirement absent from the state's proof in the matter at hand, as the prior acts of misconduct bore an insufficient nexus to the assault under review to make them material at trial. Although the prior acts involved the defendant's striking the victim, the differences in manner and severity and the circumstances surrounding each act are sufficiently dissimilar to negate the probative value of the evidence of the past acts.

Additionally, as to the issue of similarity, and in regard to the element of specific intent required to prove the crime of assault in the first degree, there is no evidence that, in the prior incidents, the defendant uti-

lized a weapon or that he intended or did, in fact, cause serious physical injury to the victim. Although the prior misconduct by the defendant, as testified to by the victim, was the result of the heat of the moment and spontaneous, there can be no question that the assault on the victim in the present case was deliberate and vicious. Those important dissimilarities belie a sufficient connection to make them probative of a specific intent on the part of the defendant to cause the victim serious physical injury by the use of a dangerous instrument.

Additionally, the prior misconduct was, in the language of one legal writer, extrinsic rather than intrinsic to the brutal attack on the victim with a knife. In his treatise on evidence, Judge Prescott discusses the distinction between intrinsic and extrinsic conduct as it relates to the admissibility of prior misconduct to prove intent—the latter defined as separate and distinct from the crime charged. See E. Prescott, supra, § 4.15.6, p. 176. Judge Prescott comments: "If . . . the prior uncharged misconduct is 'extrinsic,' namely, separate and distinct from the crime charged, the use of uncharged misconduct to prove intent is problematic because it is practically indistinguishable from prohibited propensity evidence." Id.

In my view, the evidence of the defendant's prior assaults on the victim, both spontaneous and occurring while the defendant was inflamed by some argument with the victim, are significantly different from the facts of the present assault to make evidence of the prior acts immaterial on the issue of intent.

Having determined that the evidence of the defendant's past assaults on the victim were not relevant to prove his intent to brutally attack her with a knife, causing multiple stab wounds, I, nevertheless, briefly discuss whether the admission of the prior misconduct evidence was more prejudicial than probative. I believe it was. "In determining whether the prejudicial effect of otherwise relevant evidence outweighs its probative value, we consider whether: (1) . . . the facts offered may unduly arouse the [jurors'] emotions, hostility or sympathy, (2) . . . the proof and answering evidence it provokes may create a side issue that will unduly distract the jury from the main issues, (3) . . . the evidence offered and the counterproof will consume an undue amount of time, and (4) . . . the defendant, having no reasonable ground to anticipate the evidence, is unfairly surprised and unprepared to meet it." (Internal quotation marks omitted.) *State* v. *Patterson*, 344 Conn. 281, 296, 278 A.3d 1044 (2022). In reaching my conclusion that the evidence of the defendant's prior misconduct should not have been admitted into evidence, I am aware of the great deference that must be given to the trial court when it engages in this balancing analysis. Nevertheless, the trial court's discretion in this regard

is not boundless.[8] As noted, I do not believe that the prior misconduct evidence was probative of the defendant's intent to assault the victim with the intent to cause her serious physical injury. My reasons have already been stated. Assuming, arguendo, that this evidence was minimally probative, I believe that it was substantially more prejudicial than probative.

As to the prejudicial impact of the prior misconduct evidence, I note that, at the outset of the victim's testimony, the prosecutor brought to the jury's attention that the defendant had twice before assaulted the victim. It is difficult not to believe that this very damaging evidence influenced the jury's view of the ensuing evidence, including the veracity of the defendant's alibi witnesses. In short, I believe that the likelihood that this damaging evidence skewed the jury's view of the defendant is substantial. Although it cannot be said that the prior misconduct was gruesome as compared with the assault in question, I believe it may be particularly difficult for a jury to hear that a defendant has twice before assaulted a victim but now is innocent of yet another assault. In short, by any reckoning, I believe that the prejudicial impact of this evidence substantially outweighed any remote relevance it may have had.

Also, the court's provision of limiting instructions regarding the defendant's prior acts of misconduct may not entirely cure any prejudice emanating from the admission of those facts. See, e.g., *State* v. *Juan J.*, supra, 344 Conn. 33 (holding that limiting "instructions to the jury on the proper use of this evidence [only for purposes of intent] could not cure the potential prejudice to the defendant" because "[t]he uncharged misconduct was admitted not to prove propensity but to prove the irrelevant issue of intent" (internal quotation marks omitted)).

Having determined that the court incorrectly admitted evidence of the two prior occasions of the defendant's misconduct, I turn next to the question of whether the admission of this evidence was harmful. Under the particular circumstances of this case, I am persuaded that it was.

At the outset, it is undisputed that it is the defendant's burden to prove that an evidentiary error was harmful, but, unlike the state's burden of proving that an error of constitutional magnitude is harmless beyond a reasonable doubt, the defendant's burden is less strict. In *State* v. *Fernando V.*, 331 Conn. 201, 215, 202 A.3d 350 (2019), our Supreme Court recently articulated the well established law governing harmless error review of nonconstitutional evidentiary claims. As enunciated in *Fernando V.*, "a nonconstitutional error is harmless when an appellate court has a fair assurance that the error did not substantially affect the verdict," and "cases that present the jury with a credibility contest characterized by equivocal evidence . . . [are] far more prone to

harmful error." (Internal quotation marks omitted.) Id. Additionally, when the evidentiary error involves the improper admission of uncharged misconduct evidence, "the most relevant factors to be considered are the strength of the state's case and the impact of the improperly admitted evidence on the trier of fact." (Internal quotation marks omitted.) *State* v. *Martin V.*, 102 Conn. App. 381, 388, 926 A.2d 49, cert. denied, 284 Conn. 911, 931 A.2d 933 (2007).

On the basis of my careful review of the record, I believe the scales heavily tip in favor of the defendant's argument on the question of harm because, without the evidence of the defendant's prior misconduct, the evidence of the defendant's guilt was in equipoise— that is, the state's case, shorn of the evidence of prior misconduct, likely would not have led to a determination by the jury that the defendant was guilty beyond a reasonable doubt. In short, I do not believe a reasonable review of the evidence provides a basis for a fair assurance that the evidence of prior misconduct did not affect the verdict.

Unlike my colleagues in the majority and the argument of the state, I do not believe that the state's case, without the prior misconduct evidence, was strong. The evidence at trial was a credibility contest in which the only real issue was the *identity* of the assailant. Indeed, as the prosecutor acknowledged in his closing rebuttal argument, the issue in this case was the identification of the assailant. This was, in fact, the only issue in the case. Identification of the assailant was the only issue argued by the prosecutor after he had indicated that the jury could reasonably infer specific intent by reference to the circumstances of the crime itself and after he had reminded the jury of the defendant's prior misconduct against the victim.

Additionally, although I understand that circumstantial evidence may be a sufficient basis for the conviction of a defendant, it is noteworthy that, other than the victim's identification of the defendant, there was no direct evidence of the defendant's involvement in this assault. There was no forensic evidence, no inculpatory statements, no weapon found that could be tied to the defendant, no shoe prints, or any other similar evidence. Additionally, as to circumstantial evidence, there was no evidence that the defendant and the victim had any contact for two years prior to the incident in question and, accordingly, no argument between the victim and the defendant, which, arguably, might have shed some light on the defendant's identity as the assailant. In sum, the issue of identity, the only issue at trial, was clouded because there was no evidence of any dispute between the victim and the defendant or other participants that might have given rise to this vicious attack—unlike the defendant's earlier assaults on the victim, both of which arose following heated arguments between the defen-

dant and the victim.

Although there was identification evidence pointing to the defendant, this evidence was conflicting and also was rebutted by the defendant's alibi defense. The state's first witness at trial was Sergeant Chris Hunyadi of the Hartford Police Department. He stated that, when this attack occurred, he had been a patrol officer and, in that capacity, arrived at the scene at M Street in Hartford where he saw the victim lying in a pool of blood in "the back stairwell or the back entryway of the home."[9] He indicated that he also went to the hospital where he had the opportunity to speak with the victim. Hunyadi testified that, during this conversation, the victim told him that she had not seen her attacker and that the person who attacked her was unknown to her. On redirect examination by the prosecutor, Hunyadi testified that he had spoken with the victim after she had been administered a large amount of pain medication and after medical personal had stabilized her.

In its attempt to diminish the importance of this colloquy, the state, and the majority, in turn, point to the medication administered to the victim when she was hospitalized after the attack as a reason for her inability to identify the defendant as her attacker at that time. The jury, however, was provided no information concerning the particular medications administered to the victim or the potential impact they might have had on her ability to recollect and to articulate the events as she experienced them. Thus, it is not reasonable to infer the likely affect any medications may have had on the victim's ability to recall and, specifically, to identify the person who had assaulted her. From this record, we are left only with the evidence that the victim told Hunyadi at the hospital shortly after the assault that she did not see her attacker and did not know who had attacked her.

Hunyadi's testimony that the victim was unable to identify her attacker and that the victim said she had not seen him presented a contrast to the jury when the victim herself later testified that she did recognize the defendant as her attacker at the scene and told her son, J, shortly after the attack that it had been the defendant who attacked her. The jury, then, was left with conflicting stories regarding the victim's identification or non-identification of the defendant as her assailant.

Furthermore, as noted previously in this dissenting opinion, before the victim was asked any questions at trial about the assault at issue, the prosecutor asked her about being assaulted by the defendant on two previous occasions. She testified that, in 2008, she and the defendant had gotten into an argument that turned physical, during which he hit her. The prosecutor then moved to the second incident, which occurred in 2009. The victim testified that she and the defendant had gotten into another argument, during which the defen-

dant punched her in the face.[10]

Another pillar of the state's evidence was the victim's positive identification of the defendant from the photographic array prepared by the Hartford Police Department. But the array process was significantly flawed because it included a photograph of the defendant, a man with whom the victim had lived for several years and with whom she had borne children. Such an array can hardly be seen as a random selection of potential suspects.[11]

The victim and the defendant's son, J, testified, as well. He was eleven years old at the time of the incident. At trial, he was a difficult witness.[12] At one point, he testified that the victim probably had said that the defendant had attacked her, but, he stated, he did not remember. Further in his testimony, he acknowledged that he had given the police a statement in which he had said that the victim had told him that the defendant had attacked her. He stated, as well, that, when he came upon the scene by the entryway, he saw a man moving away fast whose features were like the defendant's features.

Another witness called by the state, Louis Poma, a detective with the Hartford Police Department at the time of the charged crime, testified that he had assembled a photographic array that included a photograph of the defendant, and, when shown to the victim, she had identified the defendant as her assailant.

Against this identification testimony, the defendant presented an alibi that he was in bed at the home of his mother, O, at B Street in Hartford while the attack on the victim took place. Supporting him in this alibi defense were O and his sister, D.

O testified that the defendant lived in a bedroom on the second floor of her home.[13] She stated that, on the day in question, the defendant had arrived at her home at approximately 4:45 p.m. with S and that, shortly after their arrival, the defendant went upstairs to his bedroom. She explained that there had been an arrangement between the victim and the defendant, both S's parents, that the defendant would pick up S from school in the afternoon, bring her to B Street, often after stopping for some fast food, and that, once there, S would wait for the victim to pick her up after she had left her workplace. That was the course, O indicated, on November 16, 2011. She continued in her testimony that, at approximately 6 p.m., she received a phone call from an old friend, after which she called upstairs to the defendant. Not receiving any response, she went to the defendant's room where she discovered him sound asleep in his bed. She indicated that she had to shake the defendant to awaken him. In response to questioning from defense counsel, she noted that there was no sign of rainwater in the room, rain having fallen that

evening, and that the defendant was then wearing a T-shirt and sweatpants. Notably, she testified that the defendant could not have left the residence after his return home with S because she would have heard the squeaking of the door to the home when anyone left.

D testified that she also lived with her mother and the defendant at the B Street residence. On the day in question, she indicated that she had arrived home at approximately 5:40 p.m., and recalled that O had received a phone call at approximately 6 p.m., after which O retrieved the defendant from his room and both of them came downstairs. D testified that the defendant "looked [like] he just woke up, bed head. It looked like she woke him up from a sleep."

Finally, as to the alibi defense, Sergeant Valentine Olabisi of the Hartford Police Department, who was a patrol officer at the time of the attack on the victim, testified that he went to the B Street residence on the night of the incident where he spoke with the defendant, who asserted that he had been home during the day. Olabisi acknowledged on cross-examination that, when he was with the defendant, he did not appear to be wet and that there was no water in the area of the first floor.

Because there was incomplete and conflicting identification evidence and alibi evidence, even from family members, that the defendant was elsewhere at the time of the attack, and an absence of any direct proof of the defendant's guilt, this circumstantial evidence case was not strong. Without the evidence of the defendant's prior assaults on the victim, it is not reasonable to conclude, with any assurance, that the jury would have found the defendant guilty.

In conclusion, I believe that the reasoning of *United States* v. *Miller*, 673 F.3d 688 (7th Cir. 2012), poignantly illustrates the problem of permitting the admission of prior misconduct evidence when the issue for which it is purportedly offered is undisputed and the evidence of prior misconduct tends to prove only the defendant's propensity to commit the charged offense. In *Miller*, the United States Court of Appeals for the Seventh Circuit was confronted with the admission at trial of a defendant's prior acts of misconduct involving the possession of drugs with the intent to distribute them. Id., 692. On review, the court in *Miller* observed that, although the defendant's prior acts did, in fact, demonstrate an intent to distribute and the current charge also included, as an element of the offense, the intent to distribute, the trial court should not have admitted the prior acts on the issue of intent because that issue was "not meaningfully disputed by the defense." Id., 697. Rather, the defendant claimed that the drugs were not in fact his and that he had not even been staying in the room where the drugs were found. Id., 696. In reversing the judgment of the trial court, the Seventh Circuit opined: "And this is where the district court

erred . . . . The court focused on whether intent was at issue based on [the defendant's] defense and on the government's obligations of proof. Having concluded that intent was at issue, the court turned to analyze prejudice and . . . simply stated that the evidence was highly probative of intent. Had the court asked more specifically how the prior conviction tended to show intent eight years later, it would have recognized that it was dealing with propensity evidence all the way down. Unless there is a persuasive and specific answer to the question, 'How does this evidence prove intent?' then the real answer is almost certainly that the evidence is probative only of propensity." Id., 699. *Miller*'s operative facts are strikingly similar to those we confront in the case at hand. The defendant's intent to strike the victim two and three years before the incident in question was not probative of any intent by the defendant to assault the victim with a knife with the intent to cause her serious bodily harm. Simply put, this evidence proved nothing more than that the defendant had the propensity to be violent against the victim, which is expressly excluded by § 4-5 (a) of the Connecticut Code of Evidence.

For the foregoing reasons, I respectfully dissent.

[1] Edward J. Imwinkelried is the Edward L. Barrett, Jr., Professor of Law Emeritus at the University of California, Davis School of Law. Professor Imwinkelried is the author of several treatises and law review articles dealing with evidentiary issues, including, most notably, the topic of the admission of prior misconduct evidence in a criminal trial.

[2] See E. Imwinkelried, "The Use of Evidence of an Accused's Uncharged Misconduct to Prove Mens Rea: The Doctrines Which Threaten to Engulf the Character Evidence Prohibition," 51 Ohio St. L.J. 575, 576 (1990). In making this assertion, Professor Imwinkelried was referring specifically to rule 404 (b) of the Federal Rules of Evidence concerning the admissibility of prior bad acts, a federal rule with relevant parallels to § 4-5 of the Connecticut Code of Evidence. See id., 575–76. Indeed, a review of Westlaw indicates that, since 2002, the admissibility of evidence of prior misconduct was an issue in 355 cases in the United States Court of Appeals for the Second Circuit and, in the same time period, the parallel issue of the admissibility of prior misconduct under the Connecticut Code of Evidence was a salient issue in 245 cases in this court. Whether those numbers support the accuracy of Imwinkelried's claim, the issue of the admission of prior misconduct evidence in a criminal trial remains a dynamic issue for trial and reviewing courts because the improper admission of prior misconduct evidence puts at risk a defendant's right to the presumption of innocence. As Judge Clark of the United States Court of Appeals for the Fifth Circuit aptly put it: "A concomitant of the presumption of innocence is that a defendant must be tried for what he did, not for who he is. The reason for this rule is that it is likely that the defendant will be seriously prejudiced by the admission of evidence indicating that he has committed other crimes." *United States* v. *Myers*, 550 F.2d 1036, 1044 (5th Cir. 1977).

[3] Unlike the situation in the present case, in which the court determined the admissibility of the prior misconduct evidence before the start of evidence, other jurisdictions resolve this issue after the close of the state's case-in-chief. To minimize the risk of undue prejudice in the introduction of prior misconduct evidence, the United States Court of Appeals for the Second Circuit has adopted an approach that appears fair to both the government and the defendant. In *United States* v. *Bok*, 156 F.3d 157, 166 (2d Cir. 1998); the court opined: "Although it is generally the favored practice for the trial court to require the government to wait before putting on its similar act evidence until the defendant has shown that he will contest the issue of intent . . . such evidence is admissible during the [g]overnment's case-in-chief if it is apparent that the defendant will dispute that issue." (Citation omitted; internal quotation marks omitted.) Id.; see also *United States* v. *Inserra*, 34 F.3d 83, 90 (2d Cir. 1994); *United States* v. *Muhammad*, Docket

No. 3:12CR00206 (AVC), 2013 WL 6091860, *1 (D. Conn. November 19, 2013).

Most recently, in *State* v. *Juan J.*, 344 Conn. 1, 24 n.12, 276 A.3d 935 (2022), our Supreme Court expressed its own concern about the procedures utilized in Connecticut for the introduction of prior misconduct evidence in criminal trials. The court acknowledged that it previously had expressed a willingness to "leave it to the sound discretion of our trial courts to determine the precise procedure to employ in a particular case, consistent with their duty to safeguard against undue prejudice in cases involving uncharged misconduct evidence." (Internal quotation marks omitted.) Id. The court continued: "We note with approval, however, procedures employed by several other state and federal courts when defendants have sought to remove the issue of intent through a particular defense theory, thereby implicating how trial courts should handle the admission of uncharged misconduct evidence. By detailing the procedures undertaken in these jurisdictions, we merely intend to emphasize the caution that courts must take in admitting this evidence and that, often, a court's appropriate exercise of its discretion becomes more informed as the trial plays out." Id. The court then continued by citing examples in both state courts and in the federal courts within the Second Circuit. Id., 24–25 n.12. Our Supreme Court's gentle reminder to the trial courts is noteworthy. A trial procedure such as that recommended by the Second Circuit, which does not permit the government to introduce prior misconduct evidence in its case-in-chief unless it knows that the issue for which such evidence is offered is actually at issue, would alleviate the risk of undue prejudice that lingers in our present practice of permitting the state to introduce such evidence in its case-in-chief whether or not the defendant actually contests the particular issue.

[4] Although I believe that the evidence of the defendant's prior assaults on the victim should not have been admitted as proof of intent because the only purpose of this evidence was to prove the defendant's propensity toward violence against the victim, there may, in fact, be merit in allowing such evidence to prove propensity in a domestic violence case, as some writers have urged. See, e.g., A. Kovach, note, "Prosecutorial Use of Other Acts of Domestic Violence for Propensity Purposes: A Brief Look at its Past, Present, and Future," 2003 Ill. L. Rev. 1115 (2003); D. Ogden, comment, "Prosecuting Domestic Violence Crimes: Effectively Using Rule 404 (b) to Hold Batterers Accountable for Repeated Abuse," 34 Gonz. L. Rev. 361 (1998); P. Vartabedian, comment, "The Need to Hold Batterers Accountable: Admitting Prior Acts of Abuse in Cases of Domestic Violence," 47 Santa Clara L. Rev. 157 (2007). But see E. Collins, "The Evidentiary Rules of Engagement in the War against Domestic Violence," 90 N.Y.U. L. Rev. 397, 415–22 (2015).

In Connecticut, our Supreme Court already has recognized what has been termed battered women's syndrome. In *State* v. *Vega*, 259 Conn. 374, 788 A.2d 1221, cert. denied, 537 U.S. 836, 123 S. Ct. 152, 154 L. Ed. 2d 56 (2002), our Supreme Court concluded "that evidence of the defendant's prior incidences of violence toward the victim was relevant to the prosecution's case in that it demonstrated the manifestation of the battered women's syndrome as it affected the victim" and, "therefore, that the evidence of the defendant's prior misconduct substantiates the theory that there existed a system of criminal activity on the part of the defendant." Id., 398; see also *State* v. *Borrelli*, 227 Conn. 153, 172–73, 629 A.2d 1105 (1993).

Thus, it appears that we already have come part of the way toward allowing prior misconduct in domestic violence cases as propensity evidence without explicitly acknowledging we are doing so. For example, in *State* v. *Kantorowski*, 144 Conn. App. 477, 72 A.3d 1228, cert. denied, 310 Conn. 924, 77 A.3d 141 (2013), this court opined: "When instances of a criminal defendant's prior misconduct involve the same victim as the crimes for which the defendant presently is being tried, those acts are especially illuminative of the defendant's motivation and attitude toward that victim, and, thus, of his intent as to the incident in question." (Internal quotation marks omitted.) Id., 488; accord *State* v. *Morlo M.*, 206 Conn. App. 660, 690–91, 261 A.3d 68, cert. denied, 339 Conn. 910, 261 A.3d 745 (2021). These cases reflect an understanding that, in matters of domestic violence, past violent behavior by a defendant against the victim is a reasonable predictor of future similar bad acts. Perhaps it may be time for us to explicitly acknowledge this fact in order not only to recognize that domestic violence is often a repeated offense characterized by escalating levels of coercive control, often starting out as verbal and emotional control and resulting, over time, in incidents of serious physical violence, as already acknowledged by our Supreme Court in *State* v. *Vega*, supra, 259 Conn. 396–98. Finally, it should be noted that the phrase "battered women's syndrome" has been criticized for its focus on the victim and not on the behavior of the assailant; the suggestion has been made that, in discussing this phenomenon of escalating bad behavior

in a domestic relationship, the term "coercive control" is more apt. See E. Stark, "Re-Presenting Woman Battering: From Battered Woman Syndrome to Coercive Control," 58 Alb. L. Rev. 973, 975–76 (1995).

In addition to scholarly writings, the issue of whether in cases of domestic violence, past acts of violence by a defendant against the same victim should be admitted for propensity purposes has been the subject of recent rule making and legislation in other states. In Alaska, the legislature amended its Code of Evidence to provide, inter alia: "In a prosecution for a crime involving domestic violence or of interfering with a report of a crime involving domestic violence, evidence of other crimes involving domestic violence by the defendant against the same or another person or of interfering with a report of a crime involving domestic violence is admissible. . . ." Alaska R. Evid. 404 (b) (4).

California took a similar tack when its legislature enacted a provision within the state's Evidence Code in 1996 to permit the admission of prior acts of domestic violence in certain situations as propensity evidence. See generally *People* v. *Merchant*, 40 Cal. App. 5th 1179, 1192, 253 Cal. Rptr. 3d 766 (2019) (discussing § 1109 of Evidence Code, which "reflects the [l]egislature's determination that in domestic violence cases, similar prior offenses are uniquely probative of a defendant's guilt on a later occasion"), review denied, California Supreme Court, Docket No. S259179 (January 22, 2020).

Akin to California's approach, Illinois amended its relevant statute, although not as broadly, to permit evidence of a defendant's prior conviction for domestic battery against the same victim. In part, the Illinois statute provides: "Evidence of a prior conviction of a defendant for domestic battery, aggravated battery committed against a family or household member . . . stalking, aggravated stalking, or violation of an order of protection is admissible in a later criminal prosecution for any of these types of offenses when the victim is the same person who was the victim of the previous offense that resulted in conviction of the defendant." 725 Ill. Comp. Stat. Ann. 5/ 115-20 (a) (West 2008). Interpreting that statute, the Illinois Supreme Court in *People* v. *Chapman*, 965 N.E.2d 1119, 1124 (Ill. 2012), held that the statute had partially abrogated the common-law rule against the admission of propensity evidence. See also *People* v. *Dabbs*, 239 Ill. 2d 277, 284–85, 940 N.E.2d 1088 (2010), cert. denied, 563 U.S. 964, 131 S. Ct. 2158, 179 L. Ed. 2d 942 (2011).

In Michigan, its legislative body amended that state's Code of Evidence in 2019 to permit the admission of evidence of past acts of domestic violence for any purpose for which the offer is relevant, thus removing its ban against propensity evidence in the domestic violence context. See Mich. Comp. Laws Serv. § 768.27b (1) (LexisNexis Cum. Supp. 2021). Subsequent to the passage of this amendment, the Michigan Appeals Court interpreted the statute as permitting evidence of past acts of domestic violence as a demonstration of the defendant's propensity to commit acts of violence against women who were or had been romantically involved with him. See *People* v. *Farmer*, Docket No. 345496, 2020 WL 3120259, *10 (Mich. App. June 11, 2020).

Although Iowa has not adopted a rule expressly permitting propensity evidence in cases involving domestic violence, the Iowa Court of Appeals tacitly acknowledged that such evidence may be admitted to prove propensity in domestic violence cases because, in domestic violence, "each incident is 'connected to the others.' " *State* v. *Syperda*, Docket No. 18-1471, 2019 WL 6893791, *11 (Iowa App. December 18, 2019) (decision without published opinion, 941 N.W.2d 596). In reaching this conclusion, the court in *Syperda* appears to have carved out a common-law exception to the ban against propensity evidence to accommodate the reality that domestic violence cases are often repeated, interconnected offenses. See id.

Finally, Colorado amended its criminal code in 2021 to permit evidence of prior misconduct in certain domestic violence criminal trials. In its introduction to this amendment to its code, the Colorado General Assembly opined: "The general assembly hereby finds that domestic violence is frequently cyclical in nature, involves patterns of abuse and can consist of harm with escalating levels of seriousness. The general assembly therefore declares that evidence of similar transactions can be helpful and is necessary in some situations in prosecuting crimes involving domestic violence." Colo. Rev. Stat. § 18-6-801.5 (1) (LexisNexis 2021).

Although these developments in other jurisdictions do not represent an avalanche of change, they are an acknowledgment that the admission of prior misconduct evidence in domestic violence cases is different because these cases often involve repeated coercive behavior that often results in physical injury. I believe, respectfully, that these developments may be worthy of study in Connecticut.

[5] At oral argument before this court, the state contended that *State* v. *Gilligan*, supra, 92 Conn. 526, is inapplicable to the case at hand because,

in *State* v. *Beavers*, 290 Conn. 386, 405 n.20, 406, 963 A.2d 956 (2009), Justice Norcott, in dicta, suggested that *Gilligan* should be confined to its facts. Respectfully, given *Gilligan*'s history as a recitation of foundational law regarding the use of prior misconduct evidence in a criminal trial, I believe the dicta of *Beavers* should be closely scrutinized before discarding *Gilligan*'s principal tenet that evidence of a defendant's guilt of a prior crime is inadmissible to prove that a defendant is guilty of the crime charged against him. Citing *Gilligan*, our Supreme Court has stated: "The reason for the rule is that in the setting of a jury trial the danger of prejudice from evidence that the accused is a person of bad character and thus more likely to have committed the crime charged is deemed to outweigh the probative value of such evidence and may have no direct tendency to prove the crime charged." *State* v. *Holliday*, 159 Conn. 169, 172, 268 A.2d 368 (1970); see also *State* v. *Conroy*, 194 Conn. 623, 626, 484 A.2d 448 (1984); *State* v. *Esposito*, 192 Conn. 166, 169, 471 A.2d 949 (1984); *State* v. *Onofrio*, 179 Conn. 23, 28, 425 A.2d 560 (1979); *State* v. *Jonas*, 169 Conn. 566, 572–73, 363 A.2d 1378 (1975), cert. denied, 424 U.S. 923, 96 S. Ct. 1132, 47 L. Ed. 2d 331 (1976); *State* v. *Simborski*, 120 Conn. 624, 630–31, 182 A. 221 (1936).

[6] While this appeal was pending, our Supreme Court issued its decision in *State* v. *Juan J.*, supra, 344 Conn. 1, and, consequently, this court ordered counsel in the present case to submit supplemental briefs on the impact of *Juan J.* on the issues in this appeal. In response, the state takes the position, and the majority concludes, that *Juan J.* is inapposite because *Juan J.* involved a general intent crime and not one involving specific intent.

[7] I acknowledge that I am troubled by our jurisprudence that permits the state to offer evidence on an issue about which there is no dispute, but our Supreme Court's decision in *State* v. *Juan J.*, supra, 344 Conn. 25 n.12, regarding the proper procedure for determining whether prior misconduct evidence should be admitted may be a signal that we are moving away from that point of view. Learned treatises and other jurisdictions have taken a different tack than our past cases have on this question. In his treatise on evidence, Imwinkelried advanced the premise that, for prior misconduct evidence to be admissible to prove intent, the question of intent must be in genuine dispute. See E. Imwinkelried, Uncharged Misconduct Evidence (Rev. Ed. 1998). In making this assertion, Imwinkelried acknowledged that jurisdictions in the United States are not in agreement on this point. Id.; see also E. Imwinkelried, "The Use of Evidence of an Accused's Uncharged Misconduct to Prove Mens Rea: The Doctrines Which Threaten to Engulf the Character Evidence Prohibition," 51 Ohio St. L.J. 575, 593–96 (1990).

[8] As already noted herein, the court made the decision to admit this evidence before the evidence portion of the trial had commenced. It is difficult to understand how a judge, even the most diligent, can effectively balance the probative value of this evidence against its prejudicial effect without first hearing the state's case-in-chief. For this reason, our Supreme Court's admonition in *State* v. *Juan J.*, supra, 344 Conn. 25 n.12, and the practice of the United States Court of Appeals for the Second Circuit, as outlined in footnote 3 of this dissenting opinion, appear particularly appropriate because deferring a ruling until the finish of the state's case in order to determine which issues are actually in play enhances the likelihood that any judicial ruling on this matter will be fair both to the state and to the defendant.

[9] Evidence from the trial reveals that, at the time of the attack, just before 6 p.m. on November 16, 2011, it was dark and the rain was heavy. Additionally, a police photograph of the backdoor of the victim's home in the area in which she was attacked shows that the door was not illuminated by any light on the door on the outside of the house. See state's exhibit 3.

[10] The court immediately thereafter gave an appropriate limiting instruction to the jury. Although there was no objection to the propriety of the court's limiting instruction, I note that, in reviewing it, the court's statement to the jury that it could consider the defendant's past acts of misconduct as evidence of his intent to assault the victim in this matter could easily have been taken by the jury as a suggestion of identification, a result surely not intended by the court but emblematic of the difficulty in admitting prior misconduct evidence on the issue of intent when the only issue in the matter is, in fact, the identity of the assailant.

Also, although we are instructed that we must presume that a jury will abide by the proscriptions recited in a limiting instruction, our naivety cannot be boundless. See, e.g., *Jackson* v. *Denno*, 378 U.S. 368, 388 n.15, 84 S. Ct. 1774, 12 L. Ed. 2d 908 (1964) (reciting authorities debunking notion that juries can overlook evidence they should not have heard); see also

*Bruton* v. *United States*, 391 U.S. 123, 129 n.4, 88 S. Ct. 1620, 20 L. Ed. 2d 476 (1968) (reciting authorities that have "refused to consider an instruction as inevitably sufficient to avoid the setting aside of convictions"); A. Diaz, comment, "Restoring the Presumption of Innocence: Protecting a Defendant's Right to a Fair Trial by Closing the Door on 404 (b) Evidence," 51 St. Mary's L.J. 1001, 1015–16 (2020) ("psychological research indicates that juries are unable to ignore inadmissible evidence").

[11] To be sure, the defendant makes no claim on appeal that evidence of the photographic array was improperly admitted. Nevertheless, in assessing the strength of the state's case, it is reasonable to closely consider the persuasiveness of the array because it included a photograph of the man with whom the victim had lived for several years. The value of this array to a jury not already swayed by the evidence of the defendant's prior assaults on the victim is dubious.

[12] At one point, under questioning by the prosecutor, J blurted out, "I don't want to answer no more questions. I'm done. I don't want to be involved in this." When the court admonished him that he was to answer the questions that were being posed to him, he responded: "Crazy." It is unlikely that this exchange would have enhanced the witness' credibility before a jury untainted by the prior misconduct evidence.

[13] Based on my review of the trial transcript, it does not appear that either the state or the defense introduced any evidence regarding the distance between the victim's home and the home where the defendant was then living.

––––––––––––––––––––––––––––––